1  **GAUNTLETT & ASSOCIATES**
   David A. Gauntlett (SBN 96399)
2  James A. Lowe (SBN 215383)
   Christopher Lai (SBN 249425)
3  18400 Von Karman Avenue, Suite 300
   Irvine, California 92612
4  Telephone: (949) 553-1010
   Facsimile: (949) 553-2050
5  jal@gauntlettlaw.com
   cl@gauntlettlaw.com
6
   Attorneys for Plaintiff
7  E.PIPHANY, INC.

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10

11 E.PIPHANY, INC., a California corporation,  ) Case No.: 5:08-CV-02621-PVT
                                              )
12                                            ) Hon. Patricia V. Trumbull
                    Plaintiff,                )
13                                            ) **PLAINTIFF E.PIPHANY, INC.'S MOTION**
                                              ) **FOR PARTIAL SUMMARY JUDGMENT**
14        vs.                                 ) **ON ST. PAUL FIRE & MARINE**
                                              ) **INSURANCE COMPANY'S DUTY TO**
15                                            ) **DEFEND AND BREACH OF ITS DUTY TO**
   ST. PAUL FIRE & MARINE INSURANCE)          **DEFEND**
16 COMPANY, a Minnesota corporation,          )
                                              ) Date:      July 21, 2008
17                                            ) Time:      9:00 a.m.
                    Defendant.                ) Ctrm:      5, 4th Floor
18 _____)

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  UNDERLYING SUIT ALLEGED DISPARAGEMENT ...................................................... 1

II.  ST. PAUL POLICY COVERS DISPARAGEMENT ...................................................... 3

III.  DISPARAGEMENT ALLEGED BY SIGMA TRIGGERED A DUTY TO DEFEND ...................................................................................................................... 4

IV.  SIGMA ALLEGATIONS FIT WITHIN THE ST. PAUL POLICY COVERAGE FOR DISPARAGEMENT ........................................................................................... 5

    A.  Publication Alleged ................................................................................................ 6

    B.  Untrue or Misleading Comparative Statements Can Be Disparagement ............. 7

        1.  Allegations of Untrue or Misleading Statements Alleged ........................... 7

        2.  Disparaging Comparative Factual Assertions Are Alleged .......................... 8

            a.  *Tosoh SET* ..................................................................................... 9

            b.  *Knoll Pharmaceutical* .................................................................. 10

            c.  *Winklevoss III* .............................................................................. 10

        3.  Critical Aspects of Products at Issue ......................................................... 11

    C.  Statements Influence Customers Not to Deal with Competitors .......................... 11

        1.  Disparaging Statements Do Not Need to Name a Competitor in Order to Influence Potential Purchasers Not to Buy ................................. 11

        2.  E.piphany's Statements Were Allegedly Directed at Sigma .................... 13

        3.  Harm to Sigma's Business Alleged ............................................................ 15

        4.  A Two-Party Marketplace Makes Comparative Statements Potentially Disparaging ........................................................................... 15

    D.  Arguing No Disparagement Was Alleged Is Contrary to the Reasoning of *J. Lamb, Inc.* ...................................................................................................... 17

V.  INSURANCE BROKER SAW POTENTIAL FOR COVERAGE .................................. 18

VI.  ST. PAUL'S CONTINUED DENIALS BREACHED ITS DUTY TO DEFEND ........... 20

VII.  CONCLUSION ............................................................................................................ 21

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*American Guar. & Liab. Ins. Co. v. Vista Medical Supply,*
    699 F. Supp. 787 (N.D. Cal. 1988) ....................................................................... 16

*Anthem Elecs., Inc. v. Pacific Employers Ins. Co.,*
    302 F.3d 1049 (9th Cir. (Cal.) 2002)..................................................................... 17

*Davis H. Elliot Co. v. Caribbean Utils. Co.,*
    513 F.2d 1176 (6th Cir. (Ky.) 1975) ......................................................................... 5

*DecisionOne Corp. v. ITT Hartford Ins. Group,*
    942 F. Supp. 1038 (E.D. Pa. 1996) ................................................................... 6, 19

*Fireman's Fund Ins. Co. v. National Bank for Coops.,*
    849 F. Supp. 1347 (N.D. Cal. 1994) ..................................................................... 17

*Knoll Pharmaceutical Co. v. Automobile Ins. Co. of Hartford,*
    152 F. Supp. 2d 1026 (N.D. Ill. 2001) ................................................................. 10

*Pension Trust Fund v. Federal Ins. Co.,*
    307 F.3d 944 (9th Cir. (Cal.) 2002)................................................................ 5, 6, 20

*Winklevoss Consultants, Inc. v. Federal Ins. Co.,*
    11 F. Supp. 2d 995 (N.D. Ill. 1998) ................................................... 5, 10, 11, 12

## STATE CASES

*Acme United Corp. v. St. Paul Fire & Marine Ins. Co.,*
    214 Fed. Appx. 596, 2007 WL 186247 (7th Cir. (Wis.) Jan. 9, 2007) .................... 3, 8, 13, 14

*Atlantic Mutual Ins. Co. v. J. Lamb, Inc.,*
    100 Cal. App. 4th 1017, 123 Cal. Rptr. 2d 256 (2002) ........................... 6, 7, 12, 18

*Barnett v. Fireman's Fund Ins. Co.,*
    90 Cal. App. 4th 500, 108 Cal. Rptr. 2d 657 (2001) ........................................ 6, 20

*Belmonte v. Employers Ins. Co.,*
    83 Cal. App. 4th 430, 99 Cal. Rptr. 2d 661 (2000) ............................................... 4

*Egan v. Mutual of Omaha Ins. Co.,*
    24 Cal. 3d 809, 169 Cal. Rptr. 691 (1979) ........................................................... 17

*Horace Mann Ins. Co. v. Barbara B.,*
    4 Cal. 4th 1076, 17 Cal. Rptr. 2d 210 (1993) ........................................................ 5

*Liberty Mutual Ins. Co. v. OSI Indus.,*
    831 N.E.2d 192 (Ind. Ct. App. 2005) .................................................................. 12

*Montrose Chem. Corp. v. Superior Court,*
    6 Cal. 4th 287, 24 Cal. Rptr. 2d 467 (1993)................................................. 4, 5, 19

*Travelers Cas. & Sur. Co. v. Employers Ins. of Wausau,*
        130 Cal. App. 4th 99, 29 Cal. Rptr. 3d 609 (2005) ................................................. 5

## DOCKETED CASES

*Pennfield Oil Co. v. American Feed Indus. Ins. Co. Risk Retention Group, Inc.,*
        No. 8:05 CV315, 2007 WL 1290138 (D. Neb. March 12, 2007) ........................... 12

*Tosoh SET v. Hartford Fire Ins. Co.,*
        No. A111641, 2007 WL 1242172 (Cal. Ct. App. (1st Dist.) ............................ 3, 9, 10, 11, 13

*Western Int'l Syndication Corp. v. Gulf Ins. Co.,*
        No. 05-55092, 2007 WL 625264 (9th Cir. (Cal.) Feb. 26, 2007) .......................... 11

## FEDERAL AND LOCAL RULES

Fed. R. Civ. P. 56 ....................................................................................................... 1

Local Rule 7-2 ............................................................................................................ 1

Local Rule 56-1 .......................................................................................................... 1

## MISCELLANEOUS

WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE 1354
        (NEW DELUXE ED. 1996) ............................................................................... 15

**PLEASE TAKE NOTICE** that pursuant to Fed. R. Civ. P. 56 and Civil Local Rules 56-1 and 7-2 of the United States District Court for the Northern District of California, Plaintiff E.piphany, Inc. ("E.piphany") will move on July 21, 2008 at 9:00 a.m., or as soon thereafter as counsel may be heard, for summary judgment on the ground that Defendant St. Paul Fire and Marine Insurance Company ("St. Paul") owed a duty to defend E.piphany in the *Sigma Dynamics, Inc.* lawsuit, Case No. C04-0569 MJJ (the "*Sigma I* Action") and breached this duty to defend.

Plaintiff E.piphany moves for a summary judgment in its favor that (1) the factual allegations and the extrinsic evidence available to St. Paul in the *Sigma I* Action were sufficient to show a mere potential for coverage, giving rise to St. Paul's duty to defend E.piphany in the *Sigma I* Action and (2) St. Paul breached its duty to defend E.piphany in the *Sigma I* Action by refusing to pay E.piphany's defense fees and costs.

## I.    UNDERLYING SUIT ALLEGED DISPARAGEMENT

On February 10, 2004, Sigma Dynamics, Inc. sued E.piphany in a lawsuit styled as *Sigma Dynamics, Inc. v. E.piphany, Inc.*, U.S.D.C., N.D. Cal., No. C04-0569 MJJ (the "*Sigma I* Action"). Among other things that suit alleges that, during the St. Paul policy period of June 24, 2002 to June 24, 2003, E.piphany made certain statements in its advertising that disparaged Sigma Dynamics, Inc.'s ("Sigma") products, including:

> [E.piphany made] public claims, since at least August 2002, that it "is the first full suite CRM vendor to market a complete product suite built on J2EE" and that it has released "the only component-based, fully J2EE complete CRM suite available" . . . .

*Sigma I* Complaint ¶ 18 (**"Exhibit 1"**).

> On October 17, 2002, E.piphany issued its Q302 earnings press release, in which then Chief Executive Officer Roger Siboni was quoted as stating, "The launch of E.6 Service in August completed the E.6 Platform, the only component based, fully J2EE complete CRM suite available."

*Id.* at ¶ 23.

> E.piphany issued a worldwide press release . . . on August 20, 2002, entitled *Patricia Seybold Group Designates E.piphany E.6 as the Best CRM Architecture*. In the press release, E.piphany also stated that "E.piphany E.6 is the first end to end CRM suite designed and built on a unified J2EE-based platform."

1    *Id.* at ¶ 35.

2        Sigma also alleges that the foregoing statements have damaged it.

3            The foregoing literally false, deceptive, and misleading representations
         by E.piphany about its technology have damaged, and continue to
4            present the likelihood of damage, to Sigma Dynamics. E.piphany's
         literally false, deceptive, and misleading representations have damaged
5            Sigma's market share, sales, profits, business relationships, reputation,
         and goodwill and have caused potential purchasers of Sigma's
6            products and services to choose E.piphany's products and services
         instead of Sigma's. Such representations have caused E.piphany to
7            gain, and Sigma to lose, profits, market share, reputation, and
         goodwill.

8

9    *Id.* at ¶ 43.

10        In its second cause of action, the *Sigma I* complaint specifically alleges that E.piphany's

11   allegedly false representations about "competing products" (rather than E.piphany's own products)

12   are the cause of damage:

13            By the acts described above, E.piphany has made, and continues to
         make false and misleading statements in connection with the sale of
14            competing products and service in violation of California Business and
         Professions Code Sections 17500 *et seq.*, causing injury to Sigma
15            Dynamics and its business and property.

16   *Id.* at ¶ 52.

17            E.piphany's acts described above, including E.piphany's literally false,
         misleading, and deceptive advertising and promotional activities, have
18            caused injury to Sigma Dynamics and the general public . . . .

19   *Id.* at ¶ 54.

20        In the *Sigma I* complaint, Sigma sought compensatory, enhanced and punitive damages.

21   [*Sigma I* complaint 15:5-14]

22        In the *Sigma I* Action, Sigma alleged that E.piphany made misrepresentations about its

23   software technology which had the effect of causing customers to think less of Sigma's products that

24   are targeted by E.piphany's statements to the marketplace.

25        Although no labeled cause of action for disparagement was asserted, fact allegations in the

26   *Sigma I* Action, together with extrinsic evidence that was available to St. Paul, created a potential for

27   coverage, thereby giving rise to St. Paul's duty to defend.

28        On July 23, 2004, St. Paul confirmed, via letter, receipt of E.piphany's tender dated July 22,

1   2004.  **("Exhibit 3")**  St. Paul denied E.piphany's claim in a letter dated July 27, 2004.  **("Exhibit**

2   **4")**  A subsequent letter on November 22, 2004 from James S. Price of AON to Catherine Curry of

3   St. Paul re potential coverage was submitted.  **("Exhibit 5")**  On December 9, 2004 Catherine Curry,

4   on behalf of St. Paul, reiterated to Eric Schuldt, Assistant General Counsel of E.piphany, that St.

5   Paul would deny coverage.  **("Exhibit 6")**  On January 10, 2005 Dale J. Evensen, on behalf of St.

6   Paul, denied coverage to E.piphany in a letter to James Price of AON.  **("Exhibit 7")**

7          On September 21, 2005 E.piphany's counsel, Gauntlett & Associates, sent a re-tender letter

8   to Dale Evensen, St. Paul Travelers' coverage counsel.  **("Exhibit 8")**  On February 17, 2006, after a

9   significant delay, St. Paul responded to Gauntlett & Associates' letter of September 21, 2005, again

10  denying a defense.  **("Exhibit 9")**

11         After speaking with Gwen Nielsen, assistant general counsel for E.piphany's successor-in-

12  interest, Infor Global Solutions, Inc., St. Paul reaffirmed its denial of coverage via letter on February

13  6, 2008.  **("Exhibit 10")**

14         St. Paul breached its duty to defend E.piphany.  Instead, St. Paul relied on inapposite case

15  authority, including one case that was overturned on appeal.  The very case St. Paul extensively

16  relies on to argue that no disparagement exists in its final February 17, 2006 denial letter was

17  soundly reversed by the Seventh Circuit in *Acme United Corp. v. St. Paul Fire & Marine Ins. Co.*,

18  214 Fed. Appx. 596, 601, 2007 WL 186247, at *5 (7th Cir. (Wis.) Jan. 9, 2007).  That case, applying

19  Wisconsin law, whose coverage law principles are fully consistent with California law applicable

20  herein, as well as a subsequent California Court of Appeal decision – *Tosoh SET v. Hartford Fire*

21  *Ins. Co.*, No. A111641, 2007 WL 1242172, at *10, *11 (Cal. Ct. App. (1st Dist.) April 30, 2007 –

22  compelled St. Paul to defend the *Sigma I* Action herein.

23  **II.     ST. PAUL POLICY COVERS DISPARAGEMENT**

24         Effective June 24, 2002, St. Paul issued a Comprehensive General Liability Policy, with

25  Umbrella Excess Liability coverage, Policy No. TE09405603 (the "St. Paul policy") **("Exhibit 2")**

26  to E.piphany, Inc.  Among other things, that policy provided that St. Paul would defend and

27  indemnify E.piphany from any claims arising out of "Personal Injury" or "Advertising Injury":

28                 We'll have the right and duty to defend any protected person against a

claim or suit for injury or damage covered by this agreement. We'll have such right and duty even if all the allegations of the claim or suit are groundless, false, or fraudulent . . . .

Form G0186 Rev. 1-02, p. 5 of 29.

*Advertising injury* means injury, other than bodily injury or personal injury, that's caused by an advertising injury offense.

*Advertising injury offense* means any of the following offenses:
- Libel, or slander, in or with covered materials
- Making known to any persons or organization covered material that disparages the business, premises, products, services, work, or completed work of others.

Form G0186 Rev. 1-02, p. 4 of 29.

The policy defines these terms as follows:

*Personal injury* means injury, other than bodily injury or advertising injury, that's caused by a personal injury offense.

*Personal injury offense* means any of the following offenses:
 . . . .
- Libel, or slander, in or with covered materials
- Making known to any persons or organization covered material that disparages the business, premises, products, services, work, or completed work of others.

Form G0186 Rev. 1-02, pp. 3-4 of 29.

*Covered material* means any material in any form of expression, including material made known in or with any electronic means of communication, such as the Internet.

Form G0186 Rev. 1-02, p. 4 of 29.

## III.    DISPARAGEMENT ALLEGED BY SIGMA TRIGGERED A DUTY TO DEFEND

An insurer must defend whenever the allegations and available facts demonstrate a mere *potential* for coverage under the policy.[1]    An insurer's defense obligation extends to all suits in which it is *possible* that the insured will be found liable for covered damages. *Id.*  While only a "bare potential or possibility of coverage" is required to implicate St. Paul's duty to defend, to avoid that duty St. Paul must demonstrate that by no conceivable theory can the policy cover the claimed damages.[2]  St. Paul cannot meet its heavy burden in this case.

---

[1] *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 300, 24 Cal. Rptr. 2d 467, 474 (1993).

[2] *See Belmonte v. Employers Ins. Co.*, 83 Cal. App. 4th 430, 433, 99 Cal. Rptr. 2d 661, 663 (2000)

1    The standard for evaluation of a defense is **not** equivalent to that in a 12(b)(6) motion,[3] nor is

2    it equivalent to the standard required to prove common law commercial disparagement.[4]    In

3    determining whether an insurer has a duty to defend an insured, a court should not examine the

4    validity or merits of a claim.[5]  This is evidenced by the fact that the St. Paul policy states that St.

5    Paul has a duty to defend its insured against "groundless, false, or fraudulent" claims:

> We'll have the right and duty to defend any protected person against a
> claim or suit for injury or damage covered by this agreement.  We'll
> have such right and duty even if all of the allegations of the claim or
> suit are **groundless, false, or fraudulent**.[6]  [Emphasis added.]

9    The fact that an insurer will defend an insured for "groundless, false, or fraudulent" claims

10    demonstrates that the merits of a claim are irrelevant in determining an insurer's duty to defend.

11    Whether an insurer's duty to defend is triggered rests solely on whether the allegations and available

12    facts demonstrate a mere **potential** for coverage under the policy.[7]

## IV.    SIGMA ALLEGATIONS FIT WITHIN THE ST. PAUL POLICY COVERAGE FOR DISPARAGEMENT

15    A specifically alleged cause of action for disparagement is not required to find a duty to

16    defend[8] as "[t]he scope of the duty [to defend] does not depend on the labels given to the causes of

---

("Even the bare possibility of coverage is sufficient to trigger [the duty to defend.]"); *Montrose*, 6 Cal. 4th at 300 ("Indeed, in that case we said that 'the insurer need not defend if the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage.'").

[3]*Davis H. Elliot Co. v. Caribbean Utils. Co.*, 513 F.2d 1176, 1182 (6th Cir. (Ky.) 1975).

[4]*Winklevoss Consultants, Inc. v. Federal Ins. Co.*, 11 F. Supp. 2d 995, 1000 (N.D. Ill. 1998) ("**[T]he policy offense of 'disparagement' is not synonymous with common law commercial disparagement.** . . . The SASC still includes factual allegations that Winklevoss made false negative comparative statements about Lynchval's goods , causing Lynchval to lose sales.  It does not matter that these allegations may not meet the technical requisites for stating a commercial disparagement claim." (emphasis added)).

[5]*Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1086, 17 Cal. Rptr. 2d 210, 217 (1993) (An insurer's obligation to defend includes allegations that are false, frivolous, and groundless.).

[6]St. Paul policy, Form G0186 Rev. 1-02, p. 5 of 29.

[7]*Montrose Chem. Corp*, 6 Cal. 4th at 300; *Travelers Cas. & Sur. Co. v. Employers Ins. of Wausau*, 130 Cal. App. 4th 99, 110, 29 Cal. Rptr. 3d 609, 616 (2005).

[8]*See Pension Trust Fund v. Federal Ins. Co.*, 307 F.3d 944, 951-52 (9th Cir. (Cal.) 2002) ("[I]n *Barnett*, . . . [t]he complaint in the underlying suit stated causes of action for . . . intentional interference with contractual relations . . . . 90 Cal. App. 4th at 506.  **Nevertheless, the court found**

1   action in the third party complaint; instead it rests on whether the *alleged facts* or *known extrinsic*

2   *facts* reveal a *possibility* that the claim may be covered by the policy."[9]  St. Paul had duty to defend

3   E.piphany in the *Sigma I* Action based on allegations in the *Sigma I* complaint and available facts

4   that also showed a potential for coverage.

5           In analyzing precisely this policy language, or its equivalent, courts have defined the

6   elements of "disparagement" as:  (1) Publication of statements about a competitor's goods; (2) that

7   are untrue or misleading; (3) that are made to influence customers not to deal with the competitor's

8   goods or services.[10]  Every necessary element to establish liability for a tort that falls within the

9   offense of "disparagement" need not be alleged to demonstrate a "potential" for coverage.[11]

10          St. Paul had a duty to defend E.piphany in the *Sigma I* Action because the allegations and

11  available facts here are more than sufficient to show a potential for disparagement coverage under

12  this standard.

13          **A.     Publication Alleged**

14          The *Sigma I* Action alleged that E.piphany's allegedly disparaging statements were published

15  to others.  These allegations are so numerous that the allegations in the complaint are categorized by

16  the type of publication used by E.piphany.

17          The *Sigma I* complaint alleged that E.piphany made numerous false and misleading

18  statements to other customers, potential customers, and financial analysts through quarterly earnings

19  conference calls and quarterly earnings press releases (*Sigma I* complaint ¶¶ 21-27).  Paragraphs 28-

20  30 of the *Sigma I* complaint allege that E.piphany published false and misleading statements in

21  promotional press releases.  Paragraphs 31-32 of the *Sigma I* complaint allege that E.piphany

22  ─────────────────────────

**a duty to defend because the plaintiffs alleged facts that might give rise to a defamation claim.**
These allegations were buried within the complaint to show the moral blameworthiness of the
defendants, yet they were enough to trigger the duty to defend." (emphasis added)).

[9]*Atlantic Mutual Ins. Co. v. J. Lamb, Inc.*, 100 Cal. App. 4th 1017, 1034, 123 Cal. Rptr. 2d 256, 268
(2002); *see also Pension Trust Fund*, 307 F.3d at 951-52.

[10]*DecisionOne Corp. v. ITT Hartford Ins. Group*, 942 F. Supp. 1038, 1043 (E.D. Pa. 1996) (quoting
Black's Law Dictionary (6th ed. 1990)).

[11]*See Barnett v. Fireman's Fund Ins. Co.*, 90 Cal. App. 4th 500, 510, 108 Cal. Rptr. 2d 657, 664
(2001) ("The underlying complaint alleged publication to third persons, and the content of the
statements were allegedly disparaging.  These allegations sufficed to give rise to a potentially
covered claim.").

1  published false and misleading statements on its Website.  Paragraphs 33-43 of the *Sigma I*

2  complaint allege that E.piphany published false and misleading statements to industry analysts for

3  the purpose of influencing customers' and prospective customers' purchasing decisions.  Allegations

4  of publication are undeniable.

5  **B.      Untrue or Misleading Comparative Statements Can Be Disparagement**

6  The *Sigma I* complaint alleged that E.piphany's statements about it were untrue or

7  misleading.

8  **1.      Allegations of Untrue or Misleading Statements Alleged**

9  As the California Court of Appeal has noted, " 'disparagement' has been held to include

10  statements about a competitor's goods that are untrue or misleading." *J. Lamb, Inc.,* 100 Cal. App.

11  4th at 1035.  Falsity is not required to trigger a duty to defend; a misleading statement is enough to

12  trigger the duty.  *Id*.  Here, Sigma's allegations evidence much more than a mere potential for

13  coverage, as the entire basis of Sigma's complaint is that E.piphany made statements that were both

14  untrue **and** misleading.

15  Although the duty to defend would arise even without specific allegations in the Sigma

16  complaint that the injurious statements were false, the *Sigma I* complaint in fact alleges that

17  E.piphany's statements were both false and misleading.  Indeed, there are 20 paragraphs of the

18  complaint, over four pages' worth, subsumed under the headings "E.piphany's False and Misleading

19  Statements:  Investor Information and Conferences," "E.piphany's False and Misleading Statements:

20  Press Releases," "E.piphany's False and Misleading Statements:  E.piphany's Website," and

21  "E.piphany has Misled Prominent Industry Analysts, Research Firms, and Investors."

22  Sigma also alleges that "E.piphany's deceptive statements about its products have misled

23  prominent industry research firms, including Gartner Group and Patricia Seybold Group, in

24  published research reports which replicate E.piphany's false statements."  (*Sigma I* complaint ¶ 33).

25  In sum, E.piphany has misled investors and customers who rely on these reports when making

26  investment and purchasing decisions.  (*Sigma I* complaint ¶¶ 33-43)

27  Multiple allegations of falsity are summed up in Paragraph 43 of the complaint:

28  The foregoing literally false, deceptive, and misleading representations

1
2
3
4
5

> by E.piphany about its technology have damaged, and continue to present the likelihood of damage, to Sigma Dynamics. E.piphany's literally false, deceptive, and misleading representations have damaged Sigma's market share, sales, profits, business relationships, reputation, and goodwill and have caused potential purchasers of Sigma's product and services to choose E.piphany's products and services instead of Sigma's. Such representations have caused E.piphany to gain, and Sigma to lose, profits, market share, reputation, and goodwill.

6   *Id.* at ¶ 43.

7
8

> E.piphany's acts described above, including E.piphany's literally false, misleading, and deceptive advertising and promotional activities, caused injury to Sigma Dynamics and the general public . . . .

9   *Id.* at ¶ 49.

10        Indeed, the very gravamen of the Sigma complaint is that E.piphany's claim that it was the

11   ONLY maker of a fully J2EE-based CRM suite was untrue.

12        In *Acme United Corp. v. St. Paul Fire & Marine Ins. Co.*, 214 Fed. Appx. 596, 599-600,

13   2007 WL 186247, at *4 (7th Cir. (Wis.) 2007), the Seventh Circuit held that St. Paul had a duty to

14   defend Acme against claims of disparagement by Fiskars, arising out of Acme's claims on its

15   packaging that its scissors contain titanium, meaning they "are 3 times harder than stainless steel,"

16   "stay sharp longer" and are made in "a process that bonds titanium to a stainless steel core to

17   produce a sharper, more durable, and longer lasting cutting edge." In finding that disparagement

18   coverage was triggered, the court noted Fiskars' allegation of falsity, that "Acme's scissors and

19   paper trimmer blades have only a negligible and immaterial amount of titanium, which is not on the

20   cutting edge, and does not make the scissors harder, sharper, or more durable, or longer lasting." *Id.*

21   at 600. Just as Fiskars alleged that Acme's statements were false, Sigma alleged that, among other

22   things, E.piphany falsely stated that its software had a "full J2EE architecture" and that it was "the

23   only full-footprint vendor who actually has a full J2EE architecture."

24        Fiskars' direct allegations of falsity were enough to trigger disparagement coverage.

25   Similarly, Sigma's direct allegations that E.piphany's statements were false and misleading triggered

26   coverage.

27                    **2.    Disparaging Comparative Factual Assertions Are Alleged**

28        Not only were E.piphany's statements alleged to be untrue and misleading, the alleged

1  statements were subject to proof and thus not puffery.  Under California law, this made St. Paul's

2  duty to defend even more evident.

**a.    *Tosoh SET***

4      In *Tosoh SET v. Hartford Fire Ins. Co.*, No. A111641, 2007 WL 1242172, at *5, *11 (Cal.

5  Ct. App. (1st Dist.) April 30, 2007), the court found that Applied Materials' allegations in an

6  underlying complaint that its competitor, Tosoh SET, falsely claimed that it was the "only company

7  to develop all the detailed specifications and tolerances needed to perform true, comprehensive parts

8  and inspections" triggered disparagement coverage.  In finding that a duty to defend existed, the

9  court stressed that Tosoh SET's statements were not mere puffery, but were statements of fact that

10  could be proved or disproved.  *Id.* at *11.

11      Sigma's complaint includes the following factual allegations:

12  ●    E.piphany had delivered "one of the first end-to-end J2EE products and product

13        platforms"; a 01/23/03 Q4 `02 earnings conference call.

14  ●    "J2EE *compliance*.  The E.6 Suite is developed on the Java Two, Enterprise Edition,

15        or J2EE, development platform"; E.piphany's 2002 Annual Report.

16  ●    E.piphany is "the only full-footprint vendor who actually has a full J2EE architecture,

17        and that doesn't mean that you just, you know, cooperate with, I mean fully

18        embedded from the ground up, all Java, we're the only vendor that has that, and I

19        think we have a couple year lead"; E.piphany's CEO statement on 10/20/03.

20  ●    E.piphany E.6CRM Suite provides "a fully integrated and certified one-vendor

21        solution that delivers a true J2EE, standards-based architecture"; 01/14/03 E.piphany

22        press release.

23  ●    "E.piphany offers the only full-footprint CRM Suite natively built on a service-

24        oriented J2EE architecture"; 08/04/03 E.piphany press release.

25  ●    "All E.piphany E.6 solutions are built on the industry's most modern and innovative

26        customer relationship management (CRM) architecture based on the Java 2 platform,

27        enterprise edition (J2EE), and using a service-oriented architecture, E.6 provides

28        maximum flexibility for faster implementation and integration . . . ."  06/16/04

1    E.piphany website.

2    ●    E.piphany "is the first end-to-end CRM suite designed and built on a unified J2EE-

3    based platform"; 08/20/02 E.piphany press release.

4    E.piphany's statements are factual assertions that parallel those in *Tosoh SET*. E.piphany's

5    claim that it is "the only full-footprint vendor who actually has a full J2EE architecture" mirrors

6    Applied Materials' statement that it is the "only company to develop all the detailed specifications

7    and tolerances needed to perform true, comprehensive parts and inspections." These provable

8    statements relate to the technical specifications of the software itself. The ability to prove or

9    disprove such claims elevates these claims above mere puffery. The *Tosoh SET* court recognized

10   this significance of statements of fact and found that disparagement coverage was triggered.

### b.    *Knoll Pharmaceutical*

12   In *Knoll Pharmaceutical Co. v. Automobile Ins. Co. of Hartford*, 152 F. Supp. 2d 1026,

13   1036-39 (N.D. Ill. 2001), the court found that disparagement coverage was triggered by allegedly

14   false statements that synthetic thyroid drugs were not "bioequivalent" to [the brand name drug]

15   Synthroid.

16   *Knoll* is fully compatible with California law on the issue of whether a statement may

17   disparage a competitor by implication. *Tosoh SET*, 2007 WL 1242172, at *10. The *Tosoh SET*

18   court noted that the *Knoll* allegations were "capable of being proved or disproved" and that "the

19   failure to expressly mention the competitors or the names of their products did not make the

20   allegedly false statements any less disparaging." *Id.* (citing *Knoll*, 152 F. Supp. 2d at 1038-39).

21   The underlying allegations in *Knoll*, that synthetic drugs are not "bioequivalent" to a brand-

22   name drug, parallel the allegations here that E.piphany's software is the only "fully J2EE compliant

23   and fully Java based" CRM software suite on the market.

### c.    *Winklevoss III*

25   In *Winklevoss Consultants, Inc. v. Federal Ins. Co.*, 11 F. Supp. 2d 995, 1001 (N.D. Ill. 1998)

26   ("*Winklevoss III*"), the court found that an insurer had the duty to defend Winklevoss Consultants in

27   a suit where a competitor, Lynchval Systems, alleged that Winklevoss made a number of

28   misrepresentations about its own software. Lynchval alleged that Winklevoss misrepresented its

1   software as being "unlike any other system we are aware of" and "allows senior actuaries to be

2   'hands on' with respect to consulting assignments, but that . . . Lynchval software does not" and that

3   Winklevoss' "actuaries can 'code up' a valuation in a fraction of the time required by other systems

4   … which comparative statement was false." *Id*. at 998. The court cited Winklevoss' "false negative

5   comparative statements about Lynchval's goods" as its basis for finding disparagement coverage.

6   *Id*. at 1000.

7               **3.      Critical Aspects of Products at Issue**

8               In *Tosoh SET*, the court noted that Tosoh SET's assertions involved "critical aspects of the

9   products and services" offered by Tosoh SET and its competitors. *Tosoh SET*, 2007 WL 1242172, at

10  *11. Similarly, full J2EE architecture, all Java, fully embedded, ground-up, vendor-provided and

11  real-time interaction advisor technology are critical aspects of E.piphany's market position and key

12  to its success. The terms at issue speak of the quality and the supremacy E.piphany attained through

13  its representations. Sigma's complaint specifically alleges that E.piphany's statements addressed

14  "whether the software is written in Java and is fully compliant with J2EE application server

15  technology, since those features provide businesses with significant and measurable benefits."

16  These "significant and measurable benefits" are akin to the "critical aspects of the products and

17  services" that the *Tosoh SET* court noted.

18              In *Tosoh SET*, *Knoll Pharmaceutical* and *Winklevoss III*, courts found that untrue or

19  misleading statements that were capable of being proven or disproven triggered disparagement

20  coverage. Here, Sigma has alleged that E.piphany has made a plethora of untrue and misleading

21  statements that are based on technical aspects of its software, and therefore able to be proven or

22  disproven. As these three cases indicate, St. Paul had a duty to defend E.piphany in the *Sigma I*

23  Action.

24          **C.      Statements Influence Customers Not to Deal with Competitors**

25                  **1.      Disparaging Statements Do Not Need to Name a Competitor in Order to
                            Influence Potential Purchasers Not to Buy**

26

27          Statements do not need to name a competitor in order to trigger disparagement coverage.

28          ●   *Western Int'l Syndication Corp. v. Gulf Ins. Co.*, No. 05-55092, 2007 WL 625264, at

\*2 (9th Cir. (Cal.) Feb. 26, 2007) ("The statements [that the Apollo Show would not be distributed for the 2003/2004 broadcast season] . . . '[are] reasonably understood to cast doubt upon the existence or extent of [the Apollo's] property in ... intangible things . . . .' . . . *See Atlantic Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal.App.4th 1017, 123 Cal.Rptr.2d 256, 269 (2002); *Amerisure Ins. Co. v. Laserage Tech. Corp.*, 2 F.Supp.2d 296, 304 (W.D.N.Y.1998)." (**No explicit false statement that claimant Apollo lacked broadcast rights to the Apollo Show**));

- *J. Lamb, Inc.*, 100 Cal. App. 4th at 1034-35 (false statements that claimant, who was alleged patent infringer, was burdened with prior legal rights defamed claimant based on *Laserage* analysis) (**No explicit false statement to claimant Continental's customers that Continental was the source of products that were infringing Lamb's patent rights**);

- *Pennfield Oil Co. v. American Feed Indus. Ins. Co. Risk Retention Group, Inc.*, No. 8:05 CV315, 2007 WL 1290138, at \*1, \*8 (D. Neb. March 12, 2007) ("[T]he false assertion that [Pennfield] had FDA approval for multiple uses in advertising and loose-leaf inserts . . . [will] implicitly disparage Amphora's product because Amphora is the only other manufacturer of the product with FDA approval." (**No explicit false statement that claimant Amphora was not the only manufacturer of product with FDA approval**));

- *Liberty Mutual Ins. Co. v. OSI Indus.*, 831 N.E.2d 192, 199 (Ind. Ct. App. 2005) ("Liebermann's statements [that the Thermodyne Oven was Thermodyne's exclusive secret technology] disparaged the 'Thermodyne Oven' by creating confusion about the product and the technology in the marketplace because it was unclear as to which company, OSI/Beltec or Thermodyne, had the rights to and was producing an oven with the unique technology." (**No explicit false statement that claimant OSI/Beltec did not have any rights to market the Thermodyne Oven**));

- *Winklevoss Consultants, Inc.*, 11 F. Supp. 2d at 999 (Disparagement for "advertising injury" coverage purposes includes "statements about Lynchval's goods in [an]

1    attempt to steer customers away from Lynchval's product and toward Winklevoss'

2    product.  The claims that Winklevoss falsely advertised in its promotional materials

3    that its software was capable of 'allow[ing] senior actuaries to be "hands on" with

4    respect to consulting assignments,' but Lynchval's software was not; that Winklevoss

5    made false comparative statements about . . . the nature of both parties' products all

6    satisfy the above laymen's definition of 'disparage.' ").

7    Statements that do not explicitly name a competitor still constitute disparagement if the

8    identity of the product is clearly implied.  *Tosoh SET*, 2007 WL 1242172, at *7.  E.piphany's

9    statements clearly implied that Sigma's products were inferior to those of E.piphany.

10    Tosoh SET's statement that it was the "only company to develop all the detailed

11    specifications and tolerances needed to perform true, comprehensive parts and inspections" mirrors

12    E.piphany's statement that it is "the only full-footprint vendor who actually has a full J2EE

13    architecture."  Both the statements in *Tosoh SET* and the statements here involve precise, technical

14    aspects of competing products.  Just as Tosoh SET's statement clearly implied that Applied

15    Materials had not developed adequate specifications and tolerances,[12] E.piphany's statement clearly

16    implied that Sigma's software did not have a "full J2EE architecture."

### 2.    E.piphany's Statements Were Allegedly Directed at Sigma

18    In finding potential coverage in *Acme*, the Seventh Circuit observed:

19    Fiskars' underlying complaint specifically alleged that Acme's
    advertisements were directed at Fiskars' products and that Fiskars lost
20    sales to Acme as a result.  For example, Fiskars alleged that Acme's
    "false advertisements were calculated and likely to influence
21    purchasers' decisions on whether to purchase scissors and paper
    trimmers manufactured by Fiskars, or scissors or paper trimmers
22    manufactured by Acme." . . . Fiskars also alleged that "Acme made the
    Scissors False Advertisement and Trimmer False Advertisement
23    *intending to divert trade away from Fiskars*, which has occurred."[13]

24    These allegations about the effect of Fiskars' statements on Acme are directly analogous to

25    those made by Sigma about the effect of E.piphany's statements on Sigma.  To wit:

26    The foregoing literally false, deceptive, and misleading representations

27    ───────────────────
    [12]*Tosoh SET*, 2007 WL 1242172, at *7.

28    [13]*Acme United Corp.*, 214 Fed. Appx. at 600.

1
2
3

> by E.piphany about its technology have damaged, and continue to . . .
> damage [Sigma] . . . [and] Sigma's market share, sales, profits,
> business relationships, reputation, and goodwill, and have caused
> potential purchasers of Sigma's products and services to choose
> E.piphany's products and services instead of Sigma's.[14]

4    In *Acme*, the Seventh Circuit held that, even without the explicit mention of a competitor's

5    name, a general statement claiming that a product is technically superior constitutes disparagement.[15]

6    Paragraph 1 of the *Sigma I* complaint alleges:

7
8
9
10
11
12
13

> **Sigma Dynamics and E.piphany are direct competitors** in the
> market for software products that enable businesses to more efficiently
> manage and optimize their customer interactions.   One important
> differentiator between competing products in this market is whether
> the software is written in Java and is fully compliant with J2EE
> application server technology, since those features provide businesses
> with **significant and measurable benefits** when compared with older
> proprietary and non-standards based software (e.g. software written in
> C++). . . . E.piphany's products are not "all Java" or "fully J2EE," and
> **E.piphany's misrepresentations** about the underlying architecture
> and implementation of its products **have given it an unfair and
> undeserved advantage** over competitors.   [Emphasis added.]

14    Here, Sigma's allegations do not just parallel Fiskars', they provide an even stronger basis

15    for triggering disparagement coverage than Fiskars' allegations did.   This is because, in *Acme*,

16    Fiskars did not specifically allege that Acme's statements about its scissors were made in

17    comparison to its competitors.   *Id.* at 597.   Fiskars' allegations were based on the assertion that

18    Acme's claims impliedly suggested a comparison to all of its competitors' scissors.   *Id.* It expressly

19    stated that Acme's statements "were intended to and did deceive a substantial segment of the target

20    audience." *Id.*

21    In contrast, Sigma's allegations specifically and directly alleged a comparison; that

22    E.piphany's statements gave the impression that E.piphany's software suite was the only full J2EE

23    architecture, the first end-to-end CRM suite designed and built on a unified J2EE-based platform,

24    and a technology vendor with a couple years' lead.

25    In *Acme*, the Seventh Circuit recognized that comparison is required for a statement to

26    constitute disparagement, yet it was forced to infer from Fiskars' allegations that Acme's statements

27
28

---

[14]*Sigma I* complaint ¶ 43

[15]*Acme United Corp.*, 214 Fed. Appx. at 596.

were made in comparison with its competitors' statements.  Here, no such inference is necessary because Sigma's allegations specifically alleged that E.piphany's statements were made in comparison.  Therefore, it is even clearer here that Sigma's allegations regarding E.piphany's claims triggered disparagement coverage.

Under *Acme*, this allegation triggers disparagement coverage because E.piphany's alleged misrepresentation necessarily dishonors Sigma's product by claiming for E.piphany an advantage in the marketplace where E.piphany and Sigma are direct competitors.

### 3.    Harm to Sigma's Business Alleged

In its complaint, Sigma alleges that E.piphany's statements harmed Sigma's business:

> 43.    E.piphany's literally false, deceptive, and misleading representations have damaged Sigma's market share, sales, profits, business relationships, reputation, and goodwill, and have caused potential purchasers of Sigma's products and services to choose E.piphany's products and services instead of Sigma's.  Such representations have caused E.piphany to gain, and Sigma to lose, profits, market share, reputation, and goodwill.

These allegations directly stating that E.piphany's statements harmed Sigma's business show that E.piphany's statements were made to influence customers not to deal with Sigma's goods or services.

### 4.    A Two-Party Marketplace Makes Comparative Statements Potentially Disparaging

E.piphany's allegedly untrue or misleading statements had to influence customers not to deal with Sigma's goods or services because E.piphany and Sigma were the only two major competitors in their market.  In this "two-party marketplace," any statement to the effect that E.piphany was "the only" or "the first" would necessarily disparage Sigma's business.  Webster's Encyclopedic Unabridged Dictionary of the English Language[16] defines "only" as "without others or anything further, alone, solely, exclusively."  In other words, E.piphany's statement that it is the "only" J2EE complete CRM suite is a statement that Sigma's products are not.

Testimony in related litigation between Sigma and E.piphany provides ample evidence that

---

[16]WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE 1354 (NEW DELUXE ED. 1996).

1    Sigma and E.piphany were the only competitors in their market.  In *American Guar. & Liab. Ins. Co.*

2    *v. Vista Medical Supply*, 699 F. Supp. 787, 794 (N.D. Cal. 1988), Judge Schwarzer ruled that a

3    defense was owed the policyholder based upon a declaration submitted by plaintiff in the underlying

4    state action alleging injurious, false statements were made about her by employees of the insured.

5    The allegations regarding the false statements made about plaintiff could give rise to a claim for

6    defamation.   This raised a potential for liability that was not "tenuous and farfetched."   *Id*.

7    Similarly, this testimony in related litigation between Sigma and E.piphany supports St. Paul's duty

8    to defend.

9          In a related case between E.piphany and Sigma styled as *E.piphany, Inc. v. Sigma Dynamics,*

10   *Inc.*, *et al.*, Case No. CIV 439133, San Mateo County Superior Court, numerous individuals testified

11   that Sigma and E.piphany were the only two competitors in their market.

12         Michael Berry, an expert witness, testified that "before Sigma Dynamics came on the scene,

13   E.piphany really had no competitors in the realtime self-learning marketing model business."  [Berry

14   Testimony 45:12-19, **"Exhibit 11"**]  Mr. Berry testified that Sigma and E.piphany were the only two

15   producers of "software learning closed loop real-time analytic system[s]" in their market.  [Berry

16   Testimony 89:5-16]  Donald Dureau, a software engineer employed by Sigma, testified that, other

17   than Sigma, he could not think of another direct competitor to E.piphany's Interaction Advisor

18   software.  [Dureau Depo 136:1-10, 136:21-137:3, **"Exhibit 12"**]

19         This testimony establishes that E.piphany and Sigma were the only competitors in a "two-

20   party marketplace," meaning that any statements by E.piphany claiming it was "the only" or "the

21   first" would necessarily disparage Sigma's business.

22         In determining St. Paul's duty to defend, a court must examine whether the allegations and

23   available facts demonstrate a mere ***potential*** for coverage under the policy.  Although the Sigma

24   complaint did not contain explicit assertions that E.piphany and Sigma were the only two parties in

25   the marketplace, St. Paul cannot claim ignorance of these extrinsic facts.  The duty to investigate

26   includes the duty to consider **all facts available** to the insurer from the complaint and **other**

27

28

**sources**[17] and to look to the potential of coverage.[18]  The aforementioned deposition testimony involved facts in existence at the time of E.piphany's tender.  St. Paul, had it investigated the claim, would have uncovered these facts.

Although the allegations in the *Sigma I* complaint establish St. Paul's duty to defend, St. Paul is also chargeable with the knowledge that Sigma and E.piphany competed in a two-party marketplace.  This cements its defense obligation.

> **D.    Arguing No Disparagement Was Alleged Is Contrary to the Reasoning of *J. Lamb, Inc.***

Sigma's complaint not only alleged that E.piphany's statements were made in comparison, but alleged that the comparison specifically included all Java full-J2EE architecture vendors, which Sigma noted included itself, and that it was impacted by the false statements because the public was less willing to buy from it.

In *J. Lamb* there was, as here, no allegation that the insured directly alleged that the claimant misrepresented its legal rights.  There, as here, such an allegation was inferred.  Critically, Judge Croskey's quotation of the relevant allegations of the underlying action in *Lamb* at n.3 would fail to meet the improper test posed by St. Paul to assert potentially covered claims for disparagement or defamation.

Indeed, there were **no** allegations that Lamb advised the claimant's customers that it lied about being a non-infringer, or that expressly challenged the veracity of the claimant.  There was also **no** allegation that the claimant told its customers that its product could be purchased free and clear of patent claims by Lamb.  **If this Court adopts St. Paul's reasoning, it must expressly reject that of Judge Croskey in *Lamb*.**

---

[17]*Fireman's Fund Ins. Co. v. National Bank for Coops.*, 849 F. Supp. 1347, 1363 (N.D. Cal. 1994).

[18]*Anthem Elecs., Inc. v. Pacific Employers Ins. Co.*, 302 F.3d 1049, 1054 (9th Cir. (Cal.) 2002) ("Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy.  Furthermore, an insurer must undertake a reasonable investigation into the circumstances of the claim before denying coverage."); *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809, 819, 169 Cal. Rptr. 691, 695-96 (1979) ("[I]t is essential that an insurer fully inquire into **possible** bases that might support the insured's claim . . . . [A]n insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigation the foundation for its denial." (emphasis added)).

1    The rationale of *J. Lamb, Inc.*'s[19] analysis as applied to our facts shows the potential for

2    coverage:

> [Sigma] alleged that [E.piphany] had falsely stated to [Sigma's]
> customers that [Sigma's] products were [necessarily not those of a
> full-footprint vendor that did not have full J2EE architecture and were
> not the most technically advanced compared to E.piphany's]. Such
> allegations, in our view, clearly allege a disparagement of both
> [Sigma] as well as its products.

7    Especially read in light of the inferences that Sigma's allegations support, Sigma's lawsuit was

8    actionable under the definition of disparagement because consumers reading or hearing E.piphany's

9    statements were given the impression that its competitors, including Sigma, were not the first to

10   offer the particular technology at issue and were not capable of offering full J2EE architecture

11   embedded from the ground up all Java. It is also implicit that these qualities were highly sought in

12   the marketplace and that the company which possessed these qualities would be the market leader.

13   ## V.    INSURANCE BROKER SAW POTENTIAL FOR COVERAGE

14       E.piphany's insurance broker argued for St. Paul's duty to defend. On November 22, 2004,

15   James S. Price of Aon, E.piphany's insurance broker, sent an eight-page letter[20] to St. Paul

16   requesting that St. Paul reconsider its prior denial of a defense. Price explained that all of the

17   elements of disparagement required for coverage under the St. Paul policy were satisfied and that a

18   defense was triggered. Price specifically noted that under the personal injury wording of the St. Paul

19   policy, the numerous allegations in the *'04 Sigma* complaint evidenced coverage by satisfying every

20   element of "disparagement" as described under the St. Paul policy.

21       Price's opinion is significant because he was a senior insurance claims consultant and neutral

22   third party with no interest in this litigation. Price's opinion also is significant given the symbiotic

23   relationship between insurance brokers and insurance carriers, where brokers deal daily and directly

24   with insurance companies. Brokers do not have an interest in pursuing meritless or even

25   _____

26   [19] *J. Lamb, Inc.*, 100 Cal. App. 4th at 1034-35 ("Continental alleged that Lamb had falsely stated to
     Continental's customers that Continental's products were burdened with a prior legal right and their

27   purchase of such products would subject them to litigation. Such allegations, in our view, clearly
     allege a disparagement of both Continental as well as its products.").

28   [20]Attached as **Exhibit "5."**

1    questionable claims against insurance companies because pursuing such claims would potentially

2    have an adverse effect on the brokers' business relationships with insurance companies.    Price

3    explained that the allegations in the complaint **alone** were sufficient to trigger coverage:

4              In reviewing the allegations of the complaint, it is clear that the
              plaintiff is making claims of disparagement against [E.piphany].
5

6    [Ex. 5, p. 3]

7              A careful review of the ['04] Sigma complaint reveals that all of the
              elements necessary to establish a disparagement claim against
8              [E.piphany] are in fact alleged in the complaint.

9    [Ex. 5, p. 4]

10             [G]iven the allegations in the complaint, St. Paul has a duty to defend
              [E.piphany] for this claim.
11

12   [Ex. 5, p. 7]

13             We have not identified any exclusion in the St. Paul policy that would
              eliminate St. Paul's duty to provide a defense to [E.piphany] in this
14             matter.

15   [Ex. 5, p. 7]

16        Price's analysis relied simply on the policy language and the complaint allegations.    His

17   conclusion that a potential for coverage existed did not require any extrinsic evidence.    St. Paul's

18   duty to defend is even more apparent when considered in conjunction with the extrinsic evidence

19   that E.piphany and Sigma were the only two major competitors in their marketplace.

20        Disparagement coverage is triggered by (1) publication of statements about a competitor's

21   goods (2) that are untrue or misleading and (3) made to influence customers not to deal with the

22   competitor's goods or services.[21]    An insurer must defend whenever the allegations and available

23   facts demonstrate a mere *potential* for coverage under the policy.[22]    The factual allegations in the

24   complaint and the extrinsic evidence go beyond proving a mere potential for disparagement

25   coverage under this standard.    St. Paul cannot properly argue otherwise.    Because the factual

26   allegations in the complaint and the extrinsic evidence available go far beyond proving a mere

27   _____

28   [21]*DecisionOne Corp.*, 942 F. Supp. at 1043.

     [22]*Montrose Chem. Corp.*, 6 Cal. 4th at 300.

1  potential for coverage, St. Paul had a duty to defend E.piphany in the *Sigma I* Action.

2  **VI.    ST. PAUL'S CONTINUED DENIALS BREACHED ITS DUTY TO DEFEND**

3      St. Paul had a duty to defend E.piphany, based on the factual allegations and extrinsic

4  evidence.  It breached its duty by denying a defense to E.piphany.

5      On November 22 and December 16, 2004, AON Risk Services, E.piphany's insurance

6  broker, re-tendered the defense of the *Sigma I* Action to St. Paul.  In the November 22, 2004 letter,

7  AON demonstrated that the factual allegations of the complaint are sufficient to state a claim for

8  disparagement.  St. Paul did not dispute this.  Instead, in St. Paul's January 10, 2005 letter, St. Paul

9  asserts that AON "provided no legal support for [its] conclusion."  But that was not true.  AON

10  quoted *Pension Trust Fund v. Federal Insurance Company*, 307 F.3d 944 (2002), wherein the court

11  found:

12          The duty to defend arises when the facts alleged in the underlying
            complaint give rise to a potentially covered claim regardless of the
13          technical legal cause of action pleaded by the third party.

14  *Id*. at 952 (quoting *Barnett v. Fireman's Fund Ins. Co.*, 90 Cal. App. 4th 500, 510 (2001)).

15      As the *Pension Trust Fund* court explained, "California courts have repeatedly found that

16  remote facts buried within causes of action that may potentially give rise to coverage are sufficient to

17  invoke the defense duty."  *Id*. at 951.

18      The *Barnett* case is also instructive.  There, the underlying lawsuit arose out of a business

19  dispute between former principals of a medical practice.  However, "buried within the complaint to

20  show the moral blameworthiness of the defendants" were "nascent defamation claims."  *Pension

21  Trust Fund*, 307 F.3d at 952; *Barnett*, 90 Cal. App. 4th at 509 n.3.  Even though such claims were

22  not asserted, their mere *potential* was enough to trigger the duty to defend.  *Id*. at 510.  The

23  allegations in the *Sigma I* complaint explicitly accused E.piphany of making statements that

24  disparaged Sigma's products and business.  Even if this were not so, the facts alleged (as AON

25  pointed out and St. Paul conceded) are sufficient to allege "disparagement."  This is more than

26  sufficient to trigger the duty to defend.  St. Paul failed to recognize this, thereby breaching its duty to

27  defend E.piphany in the *Sigma I* Action.

28

**VII.    CONCLUSION**

The court should find that E.piphany was entitled to a defense in the *Sigma I* Action and that St. Paul breached its duty to defend E.piphany.


Dated:  June 12, 2008                                    **GAUNTLETT & ASSOCIATES**


By:    /s/ David A. Gauntlett
        David A. Gauntlett
        James A. Lowe
        Christopher Lai

Attorneys for Plaintiff
E.piphany, Inc.

1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                  **NORTHERN DISTRICT OF CALIFORNIA**

10

11  E.PIPHANY, INC., a California corporation,    )    Case No.:  CV-08-2621-PVT
                                                  )
12                                                )    Hon. Patricia V. Trumbull
                              Plaintiff,          )
13                                                )    **[PROPOSED] ORDER GRANTING**
                                                  )    **PLAINTIFF'S MOTION FOR**
14              vs.                               )    **PARTIAL SUMMARY JUDGMENT**
                                                  )
15                                                )
    ST. PAUL  FIRE  &  MARINE  INSURANCE)
16  COMPANY, a Minnesota corporation,            )    Date:          July 21, 2008
                                                  )    Time:          9:00 a.m.
17                                                )    Ctrm:          5, 4th Floor
                              Defendant.          )
18  _____)

19

20

21

22

23

24

25

26

27

28

1    This matter came on for hearing on June 21, 2008, upon Plaintiff E.piphany, Inc.'s Motion

2 for Partial Summary Judgment.  The Court, being fully advised and after considering all of the

3 evidence and argument, makes the following findings and conclusions:

4    1.    St. Paul had a duty to defend E.piphany under the Commercial General Liability

5 policy it issued to E.piphany against claims asserted in the *Sigma I* complaint;

6    2.    St. Paul breached its duty to defend and must promptly pay all attorneys' fees and

7 costs incurred by E.piphany in defense of the claims asserted in the *Sigma I* complaint, with pre-

8 judgment interest accruing thereon from the date of each invoice at the legal rate of 10% per annum;

9    THEREFORE, Plaintiff's Motion for Partial Summary Judgment is GRANTED.

10

11

12 Dated: _____                        _____

13                                                         Patricia V. Trumbull
                                                      United States Magistrate Judge

14

15

16 Prepared by:

17 GAUNTLETT & ASSOCIATES
   David A. Gauntlett (SBN 96399)
18 James A. Lowe (SBN 214383)
   Christopher Lai (SBN 249425)
19 18400 Von Karman, Suite 300
   Irvine, California 92612
20 Telephone: (949) 553-1010
   Facsimile:  (949) 553-2050
21
   Attorneys for Plaintiff
22 E.piphany, Inc.

23

24

25

26

27

28