1  **GAUNTLETT & ASSOCIATES**
   David A. Gauntlett (SBN 96399)
2  James A. Lowe (SBN 215383)
   Christopher Lai (SBN 249425)
3  18400 Von Karman Avenue, Suite 300
   Irvine, California 92612
4  Telephone: (949) 553-1010
   Facsimile: (949) 553-2050
5  jal@gauntlettlaw.com
   cl@gauntlettlaw.com
6
   Attorneys for Plaintiff
7  E.PIPHANY, INC.

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10

11 E.PIPHANY, INC., a California corporation,    ) Case No.: CV-08-2621-PVT
                                                 )
12                                               ) Hon. Patricia V. Trumbull
                  Plaintiff,                     )
13                                               ) **DECLARATION OF JAMES A. LOWE IN**
                                                 ) **SUPPORT OF PLAINTIFF E.PIPHANY,**
14      vs.                                      ) **INC.'S MOTION FOR PARTIAL**
                                                 ) **SUMMARY JUDGMENT ON ST. PAUL**
15                                               ) **FIRE & MARINE INSURANCE**
   ST. PAUL FIRE & MARINE INSURANCE)             **COMPANY'S DUTY TO DEFEND AND**
16 COMPANY, a Minnesota corporation,            ) **BREACH OF ITS DUTY TO DEFEND**
                                                 )
17                                               ) Date:      July 21, 2008
                  Defendant.                     ) Time:      9:00 a.m.
18                                               ) Ctrm:      5, 4th Floor
                                                 )
19

20

21

22

23

24

25

26

27

28

1    I, JAMES A. LOWE, declare:

2    1.    I am an attorney duly licensed to practice law before all courts of the State of

3    California, as well as before the United States District Court for the Northern District of California.

4    I am a partner with the law firm of Gauntlett & Associates, counsel of record in this litigation for

5    Epiphany, Inc. ("Epiphany").   I know the facts set forth in this declaration to be true and correct

6    based on my personal knowledge thereof and, if called to testify, I could and would testify

7    competently thereto.

8    2.    Attached as **Exhibit "8"** is a letter written by Eric R. Little, an attorney with

9    Gauntlett & Associates whom I supervised, mailed on September 21, 2005 to Dale J. Evensen whom

10   I understand to be and have reason to believe is an attorney employed by St. Paul Fire and Marine

11   Insurance Company ("St. Paul").

12   3.    Attached as **Exhibit "9"** is a letter sent by Dale J. Evensen to Eric R. Little in late

13   February 2006 responding to Gauntlett & Associates' letter attached as **Exhibit "8."**

14   4.    **Exhibits "8"** and **"9"** have been maintained in the normal course of business in the

15   files of Gauntlett & Associates.

16

17   I declare under penalty of perjury under the laws of the United States that the foregoing is

18   true and correct.

19

20

21

22

23   Dated:        June 11, 2008

24                                                            James A. Lowe

25

26

27

28

**EXHIBIT 8**



**GAUNTLETT & ASSOCIATES**
A T T O R N E Y S   A T   L A W

18400 Von Karman, Suite 300
Irvine, California 92612
Phone: (949) 553-1010
Facsimile: (949) 553-2050
———
Email: info@gauntlettlaw.com
Website: www.gauntlettlaw.com

Our File Number:
10513-003

September 21, 2005

**CONFIDENTIAL INSURED-INSURER COMMUNICATION**
This communication is an insured-insurer confidential communication. Any information disclosed by the insured or by independent counsel is not a waiver of the privilege as to any other party.

**VIA FACSIMILE AND U.S. MAIL**
**651-310-3344**

Dale J. Evensen, Esq.
Claim - Technology
508T
St. Paul Travelers
385 Washington Street
St. Paul, MN 55102

> **Re:**  ***Sigma Dynamics, Inc. v. E.piphany, Inc.***
> **U.S.D.C., N.D. Cal. No. C04 0569 MJJ**
> **Your Claim No:**    **TE09405602**
> **Insured:**    **E.piphany, Inc.**
> **Policy No.**    **TE09405602 (Effective 6/24/02)**

Dear Mr. Evensen:

We have been retained by E.piphany to assist it with the issue of coverage for the above-referenced claim. St. Paul should take this opportunity to meet its contractual obligation and honor its duty to defend.

**I.    THE POLICY**

Effective June 24, 2002, St. Paul issued a Comprehensive General Liability Policy, with Umbrella Excess Liability coverage, Policy No. TE09405602 to E.piphany, Inc. Among other things, that policy provided that St. Paul would defend and indemnify E.piphany from any claims arising out of "Personal Injury" or "Advertising Injury":

# EXHIBIT 8

10513-003-09/21/2005-151333.1

We'll have the right and duty to defend any protected person against a claim or suit for injury or damage covered by this agreement. We'll have such right and duty even if all the allegations of the claim or suit are groundless, false, or fraudulent . . . .

Form 47150 Rev 7-01, p. 4 of 28.

The policy defines these terms as follows:

*Personal injury* means injury, other than bodily injury or advertising injury, that's caused by a personal injury offense.

*Personal injury offense* means any of the following offenses:
. . . .
- • Libel, or slander, in or with covered materials
- • Making known to any persons or organization covered material that disparages the business, premises, products, services, work, or completed work of others.

Form 47150 Rev 7-01, p. 3 of 28.

*Advertising injury* means injury, other than bodily injury or personal injury, that's caused by an advertising injury offense.

*Advertising injury offense* means any of the following offenses:
- • Libel, or slander, in or with covered materials
- • Making known to any persons or organization covered material that disparages the business, premises, products, services, work, or completed work of others.

Form 47150 Rev 7-01, p. 4 of 28.

*Covered material* means any material in any form of expression, including material made known in or with any electronic means of communication, such as the Internet.

Form 47150 Rev 7-01, p. 3 of 28.

## II.    THE CLAIM

On February 10, 2004, Sigma Dynamics, Inc. sued E.piphany in a lawsuit entitled *Sigma Dynamics, Inc. v. E.piphany, Inc.*, U.S.D.C., N.D. Cal. No. C04 0569 MJJ. Among other things, that suit alleges that, during the policy period, E.piphany made certain statements in its advertising that disparaged Sigma Dynamics, Inc.'s ("SDI") products, including:

[E.piphany made] public claims, since at least August 2002, that it "is the first full suite CRM vendor to market a complete product suite built on J2EE" and that it has released "the only component-based, fully J2EE complete CRM suite available" . . . .

*SDI* Complaint ¶ 17.

On October 17, 2002, E.piphany issued its Q302 earnings press release, in which then Chief Executive Officer Roger Siboni was quoted as stating, "The launch of E.6 Service in August completed the E.6 Platform, the only component based, fully J2EE complete CRM suite available."

*Id.* at ¶ 20.

E.piphany issued a worldwide press release . . . on August 20, 2002, entitled *Patricia Seybold Group Designates E.piphany E.6 as the Best CRM Architecture*. In the press release, E.piphany also stated that "E.piphany E.6 is the first end to end CRM suite designed and built on a unified J2EE-based platform."

*Id.* at ¶ 31.

Sigma also alleges that the foregoing statements have damaged it.

The foregoing literally false, deceptive, and misleading representations by E.piphany about its technology have damaged, and continue to present the likelihood of damage, to Sigma Dynamics. E.piphany's literally false, deceptive, and misleading representations have damaged Sigma's market share, sales, profits, business relationships, reputation, and goodwill and have cause potential purchasers of Sigma's product and services to choose E.piphany's products and services instead of Sigma's. Such representations have caused E.piphany to gain, and Sigma to lose, profits, market share, reputation, and goodwill.

*Id.* at ¶ 39.

In its second cause of action, the SDI complaint specifically alleges that E.piphany's allegedly false representations about "competing products" (rather than E.piphany's own products) are the cause of damage:

By the acts described above, E.piphany has made, and continues to make false and misleading statements in connection with the sale of competing products and service in violation of California Business and Professions Code Sections 17500 *et seq.*, causing injury to Sigma Dynamics and its business and property.

*Id.* at ¶ 48.

E.piphany's acts described above, including E.piphany's literally false, misleading, and deceptive advertising and promotional activities, have caused injury to Sigma Dynamics and the general public . . . .

*Id.* at ¶ 50.

A copy of the complaint is attached hereto for your convenience.

## III.    ANALYSIS

### A.    It Is Apparent that St. Paul Has a Duty to Defend E.piphany

Under California law, the duty to defend is broader than the duty to indemnify.

> [E.piphany] is entitled to a defense if the [*SDI*] complaint alleges [E.piphany's] liability for damages *potentially* covered under the policy, or if the complaint might be amended to give rise to a liability that would be covered under the policy.

*Montrose Chem. Corp. v. Superior Ct.*, 6 Cal. 4th 287, 299 (1993) (italics in original); *see also Blue Ridge Ins. Co. v. Jacobsen,* 25 Cal. 4th 489, 497 (2001). Simply, St. Paul's duty to defend was triggered if the SDI Complaint could, under any conceivable theory, raise a single issue that could potentially be covered under the policy. *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 275 n.15 (1966).

Whether there is a duty to defend "is determined at the outset of the underlying action by comparing the policy provisions with the complaint allegations and any relevant extrinsic evidence to determine if there is any potential of coverage under the policy." *Maryland Casualty Co. v. National American Ins*. Co., 48 Cal. App. 4th 1822, 1828 (1996).

Comparing the allegations cited above to the definitions in the policy, it is apparent that SDI is alleging that it was damaged by E.piphany's "[m]aking known to any persons or organization covered material that disparage[d]" SDI's business and products. By saying it was the "only" or "first" company with a complete J2EE CRM suite, E.piphany is explicitly stating that SDI's competing products are not so. These statements allegedly disparage SDI's products. Such allegations certainly trigger St. Paul's duty to defend.

### B.    The Enumerated Offense of "Disparagement" Is Factually Alleged in the Interference Counts

#### 1.    The Allegations in the SDI Complaint Satisfy the Elements to Trigger Potential Coverage for "Disparagement"

The fact allegations compel a defense under St. Paul's express coverage for the "personal injury" and "advertising injury" offense of "making known to any person or organization covered material that disparages the business, premises, products, work or completed work of others."

At the outset, it is important to distinguish "defamation" from "disparagement." As one well-known treatise explained,

> The origins of the tort of commercial disparagement and that of defamation are distinct: . . . [T]he tort of defamation stems from the law's desire to remedy damaged reputation caused by falsity. Thus, while a defamation claim deals with injury to the reputation of a person, disparagement deals with commercial damage to a product. As a California court noted, the two torts are distinct; that is, "trade libel" is not true libel and is not actionable as defamation. [n.3.] *[Polygram*

Page 4

> *Records, Inc. v. Superior Court*, 170 Cal. App. 3d 543, 549, 216 Cal. Rptr. 252 (1st Dist. 1985).]

J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 27:101 at 27-187-188 (4th ed. 2000) (Release #27, 9/2003).

   In analyzing the type of policy language found in St. Paul's policy, courts have defined the "disparagement" offense as satisfied where there is:  (1) Publication of statements about a competitor's goods; (2) that are untrue or misleading; and (3) made to influence customers not to deal with the competitor's goods or services. *DecisionOne Corp. v. ITT Hartford Ins. Group*, 942 F. Supp. 1038, 1043 (E.D. Pa. 1996) (quoting BLACK'S LAW DICTIONARY (6th ed. 1990)).

### a.      Publication of Statements about a Competitor's Goods

   The allegedly false statements upon which SDI bases its claim include E.piphany's statements that it was the "only" or "first" manufacturer with a certain type of product:

> [E.piphany made] public claims, since at least August 2002, that it "is the first full suite CRM vendor to market a complete product suite built on J2EE" and that it has released "the only component-based, fully J2EE complete CRM suite available" . . . .

*SDI* Complaint ¶ 17.

> On October 17, 2002, E.piphany issued its Q302 earnings press release, in which then Chief Executive Officer Roger Siboni was quoted as stating, "The launch of E.6 Service in August completed the E.6 Platform, the only component based, fully J2EE complete CRM suite available."

*Id.* at ¶ 20.

> E.piphany issued a worldwide press release . . . on August 20, 2002, entitled *Patricia Seybold Group Designates E.piphany E.6 as the Best CRM Architecture*. In the press release, E.piphany also stated that "E.piphany E.6 is the first end to end CRM suite designed and built on a unified J2EE-based platform."

*Id.* at ¶ 31.

> By the acts described above, E.piphany has made, and continues to make false and misleading statements in connection with the sale of competing products and service in violation of California Business and Professions Code Sections 17500 *et seq.*, causing injury to Sigma Dynamics and its business and property.

*Id.* at ¶ 48.

   Although these statements focus on E.piphany's products, they are also, necessarily, about SDI's products.

According to Roget's II: The New Thesaurus, Third Edition (1995), "only" means "to the exclusion of anyone or anything else." The Merriam-Webster online dictionary defines it as "alone in class or kind." In other words, E.piphany's statement that it is the "only" J2EE complete CRM suite is a statement that SDI's products are not. The statements are semantically equivalent.

Similarly, Merriam-Webster online defines "first" as "preceding all others in time, order, or importance." The Compact Oxford English Dictionary (1995) defines it as "coming before all others in time or order; earliest." Thus, when E.piphany says its products are the "first" completely J2EE products, it is saying that SDI's are not completely J2EE. I.e., it is disparaging SDI's products.

Indeed, the SDI complaint specifically notes that E.piphany's claim to be fully J2EE is important because it "differentiates" E.piphany's products from, among others, SDI's products. For example, in the very first paragraph of the complaint, SDI alleges that

> One important differentiator between competing products in this market is whether the software is written in Java and is fully compliant with J2EE application server technology, since those features provide businesses with significant measurable benefits when compared with older proprietary and non-standards based software (e.g., software written in C++).

*Id.* at ¶ 1. In fact, this allegedly false "differentiation" is at the core of SDI's complaints about E.piphany's statements.

> E.piphany has made its claim to be "all Java" or "fully J2EE" a core part of its positioning in the market, and claims a competitive advantage over other software vendors based on that alleged differentiator.

*Id.* at ¶ 16.

> Interaction Advisor is E.piphany's real time analytics product line, and is a significant driver of the company's revenues as well as its industry recognition and differentiation.

*Id.* at ¶ 18.

Obviously, a "differentiation" between products is a statement about both products, even if phrased in language that only refers to one of them. As the Merriam-Webster Online Dictionary (2005) defines it, to "differentiate" is "to mark or show a difference in: constitute a difference that distinguishes" between things. I.e., it is a statement about two things and the relationship between them. Thus, E.piphany's allegedly false statements that it is the "only" or "first" fully J2EE CRM application are statements about SDI's products as well as E.piphany's products.

The allegations in the SDI Complaint regarding communications by E.piphany to customers and the press give rise to the potential for coverage for "personal injury" within the St. Paul policy. Communications were allegedly made to customers orally and in writing constituting "covered material" within St. Paul's policy period which necessarily described SDI's "business, products, services, work, [and] completed work."

### b.    That Are Untrue or Misleading

Although falsity is a necessary element of a claim for disparagement, the underlying complaint need not include specific allegations thereof to trigger the duty to defend. California courts have held that, wherever the underlying complaint alleges the publication of injurious statements, even without specific allegations of falsity, a potential claim for disparagement arises which requires the insurer to defend.

> In California . . . the plaintiff need only plead that the defendant published specified types of defamatory statements; the plaintiff need not specially allege the statements were false. (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, §§ 694-696, pp. 154-156.) The underlying complaint alleged publication to third persons, and the content of the statements were allegedly disparaging. These allegations sufficed to give rise to a potentially covered claim.

*Barnett v. Fireman's Fund Ins. Co.*, 90 Cal. App. 4th 500, 510 n.5 (2001).

Although the duty to defend would arise even without specific allegations in the SDI complaint that the injurious statements were false, the SDI complaint in fact alleges such. Indeed, there are 20 paragraphs of the complaint, over four pages' worth, subsumed under the headings "E.piphany's False and Misleading Statements:    Investor Information and Conferences," "E.piphany's False and Misleading Statements:  Press Releases," "E.piphany's False and Misleading Statements:   E.piphany's Website," and "E.piphany has Misled Prominent Industry Analysts, Research Firms, and Investors." These multiple allegations of falsity are summed up in Paragraph 39 of the complaint:

> The foregoing literally false, deceptive, and misleading representations by E.piphany about its technology have damaged, and continue to present the likelihood of damage, to Sigma Dynamics. E.piphany's literally false, deceptive, and misleading representations have damaged Sigma's market share, sales, profits, business relationships, reputation, and goodwill and have caused potential purchasers of Sigma's product and services to choose E.piphany's products and services instead of Sigma's.  Such representations have caused E.piphany to gain, and Sigma to lose, profits, market share, reputation, and goodwill.

*Id.* at ¶ 39.

> E.piphany's acts described above, including E.piphany's literally false, misleading, and deceptive advertising and promotional activities, have caused injury to Sigma Dynamics and the general public
> . . . .

*Id.* at ¶ 50.

Indeed, the very gravamen of the SDI complaint is that E.piphany's claim that it was the ONLY maker of a fully J2EE based CRM suite was untrue.

### c.    To Influence Customers Not to Deal with Competitor's Goods

It cannot be denied that SDI alleges the purpose, and effect, of E.piphany's allegedly false statements was to divert customers from SDI to E.piphany.

> The foregoing literally false, deceptive, and misleading representations by E.piphany about its technology have damaged, and continue to present the likelihood of damage, to Sigma Dynamics. E.piphany's literally false, deceptive, and misleading representations have damaged Sigma's market share, sales, profits, business relationships, reputation, and goodwill and have caused potential purchasers of Sigma's product and services to choose E.piphany's products and services instead of Sigma's. Such representations have cause E.piphany to gain, and Sigma to lose, profits, market share, reputation, and goodwill.

*Id.* at ¶ 39.

In *Pension Trust Fund v. Federal Ins. Co.*, 307 F.3d 944 (9th Cir. (Cal.) 2002), the court reversed the district court which had too narrowly construed fact allegations and found a duty to defend implicated for allegations of non-ERISA obligations under a fiduciary liability policy:

> California courts have repeatedly found that remote facts buried within causes of action that may potentially give rise to coverage are sufficient to invoke the defense duty. *See, e.g., Barnett v. Fireman's Fund Ins. Co.*, 90 Cal. App. 4th 500 (2001); *CNA Cas. of Cal. v. Seaboard Sur. Co.*, 176 Cal. App. 3d 598, 222 Cal. Rptr. 276 (1986). *See also Dobrin v. Allstate Ins. Co.*, 897 F. Supp. 442, 444 (C.D. Cal. 1995). Thus, California law does not require that the insured's conduct proximately cause the third party claim in order to trigger the defense duty.
>
> [n4]   The *CNA* court cited approvingly to *Ruder & Finn v. Seaboard Sur.*, 52 N.Y.2d 663, 439 N.Y.S.2d 858, 422 N.E.2d 518 (1981), wherein a New York court determined that an insurance company had a duty to defend its insured against an antitrust action that included an allegation of "false disparagement." *See CNA*, 176 Cal. App. 3d at 611-12. The court rejected the insurer's argument that "two solitary, unsubstantiated words" buried within a "completely unrelated federal antitrust cause of action, which was, itself, undisputedly *not* covered" could not trigger the duty to defend. 176 Cal. App. 3d at 612. The test for the New York court was whether the claim, "liberally construed, . . . [was] within the embrace of the policy." 176 Cal. App. 3d at 612 n. 7. The defense duty, it held, is triggered even if an element of a covered action is omitted. *Ruder & Finn*, 52 N.Y.2d at 670.] [*Id.* at 951 & n.4.]

Here, there are more than several unsubstantiated words. Rather, SDI specifically alleges a continuing course of activity in which E.piphany (1) falsely (2) told customers, and the press, that its products were differentiated from others, including SDI's products, (3) for the purpose of diverting customers from SDI to E.piphany.

### C.    Prior Tenders of This Claim Have Demonstrated the Existence of St. Paul's Duty

On November 22 and December 16, 2004, AON Risk Services re-tendered this claim to St. Paul for a defense. In the November 22 letter, AON demonstrated that the factual allegations of the complaint are sufficient to state a claim for disparagement. St. Paul does not dispute this.

Instead, in St. Paul's January 10, 2005 letter, St. Paul asserts that AON "provided no legal support for [its] conclusion." But that is not true. AON quoted *Pension Trust Fund v. Federal Insurance Company*, 307 F.3d 944, 951 (2002), which held that

> "the duty to defend arises when the facts alleged in the underlying complaint give rise to a potentially covered claim regardless of the technical legal cause of action pleaded by the third party."

*Id*. at 951 (quoting *Barnett v. Fireman's Fund Ins. Co.*, 90 Cal. App. 4th 500, 510 (2001)). As the *Pension Fund* court explained, "California courts have repeatedly found that remote facts buried within causes of action that may potentially give rise to coverage are sufficient to invoke the defense duty." 307 F.3d at 951.

The *Barnett* case is instructive. There, the underlying lawsuit arose out of a business dispute between former principals of a medical practice. However, "buried within the complaint to show the moral blameworthiness of the defendants" were "nascent claims for defamation." *Pension Trust Fund*, 307 F.3d at 951, *Barnett*, 90 Cal. App. 4th at 509 n.3. Even though such claims were not asserted, their mere *potential* was enough to trigger the duty to defend. *Barnett*, 90 Cal. App. 4th at 510.

As discussed above (and below), the allegations in the *SDI* complaint explicitly accuse E.piphany of making statements that disparage SDI's products and business. Even if this were not so, the facts alleged (as AON pointed out and St. Paul conceded) are sufficient to allege "disparagement." This is more than sufficient to trigger the duty to defend.

### D.    St. Paul's Denials are Ill-Founded and Unreasonable

St. Paul's previous denials of this claim have relied on the fact that the allegedly disparaging statements "are nothing more than alleged false representations or false advertising of the qualities of the insured's products or services." This reliance is ill-founded for two reasons: First, it is incorrect. Second, it is an insufficient basis upon which to deny coverage because there is no requirement in the policy that the disparaging statements be about the claimant's product.

As demonstrated above, E.piphany's allegedly false statements comparing their CRM program to others (including SDI's) and allegedly falsely differentiating their CRM program from others (including SDI) are, in fact, statements about the products of others (including SDI). Although phrased to focus on E.piphany's products, they carry a semantic meaning that necessarily includes a statement as to the products to which E.piphany is comparing itself. In other words, the allegedly false statements are about SDI's products.

Even if this was not true, the fact that E.piphany's statements focus on its own products is irrelevant to the question of coverage. There is nothing in the policy language that requires that the disparaging statement be about the claimant's products. Both "personal injury" and "advertising injury" arise from the publication of "covered material." The definition of "covered material" is quite broad: "any material in any form of expression." There is nothing in the policy that limits coverage to material with any particular focus.

The citation in St. Paul's January 10, 2005 letter to *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 232 Cal. Rptr. 542, (1986) is inapposite for several reasons. The "defamation" claim therein was against a newspaper and, therefore, required meeting the heightened standards set by the First Amendment. *Id.* at 1041. Freedom of the Press is not implicated in this suit. Also, that case dealt solely with the requirements for a successful claim for defamation. Defamation is not at issue here; disparagement is. Moreover, the policy provides coverage for potential claims asserted, whether they will be successful or not. Indeed, the policy explicitly provides that St. Paul will defend E.piphany from these claims even if "the allegations of the claim are groundless, false, or fraudulent."

Similarly, the contention in St. Paul's January 10, 2005 letter that none of the allegedly injurious statements were "of and concerning" SDI is also incorrect. It is black letter law that

> One who publishes defamatory matter concerning a group or class of persons is subject to liability to an individual member of it if . . .
> (a) the group or class is so small that the matter can reasonably be understood to refer to the member, or
> (b) the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member.

RESTATEMENT (SECOND) OF TORTS § 564A (2005). California courts have interpreted this standard to allow a member of a group to bring an action for defamation if the allegedly defamatory statement "mentions him or refers to him by reasonable implication." *Khawar v. Globe Int'l, Inc.*, 54 Cal. Rptr. 2d 92, 111 (1996). In the circumstance of this case, there can be no doubt that E.piphany's allegedly injurious statements were understood by all to refer to SDI's products. There is a discrete and defined market for these products, with a very high level of product awareness; the purchasers (and suppliers) are extremely knowledgeable and very cognizant of the marketplace. When E.piphany said it was the "only" J2EE complete CRM suite, it said that *every* competing product was not. This, necessarily, applies to SDI's products.

The cases cited in St. Paul's January 10, 2005 letter are either completely irrelevant or so factually dissimilar to the situation here that they offer no guidance for this situation.

*Applied Bolting Technology Products, Inc. v. U.S. Fidelity & Guar. Co.*, 942 F. Supp. 1029 (E.D. Pa. 1996), is irrelevant to this case. The issue there was whether certain statements constituted a "misappropriation of advertising ideas or style of doing business." *Id.* at 1033. The claims in this matter are based on an entirely different definition of personal and advertising injury.

In *Cables & Accessories, Inc. v. Hartford Ins. Co.*, 2002 WL 77114 (Cal. App. (6th Dist.) Jan. 8, 2002), the underlying lawsuit arose from the insured's breach of a contract to supply UL-approved power strips. There were no statements comparing the non-conforming goods to those of a competitor and no statements concerning the nature of a competitor's product. I.e., there was no "covered material," let alone disparagement. Thus, it cannot be analogized to this case. Similarly, *Aetna Cas. & Sur. Co. v. Centennial Ins. Co.*, 838 F.2d 346 (9th Cir. 1988), is factually different. There, the underlying lawsuit was premised solely on the insured's "passing off" of the claimant's

goods as the insured's products. There were no facts alleged (as there are here) which constituted a covered claim.

*Nichols v. Great American Insurance Companies*, 169 Cal. App. 3d 766, 215 Cal. Rptr. 416 (1985) is also clearly factually different. There, the underlying lawsuit alleged that the insured had engaged in unlawful practices by pirating satellite television signals. Moreover, the policy excluded statements made in the course of advertising from the definition of "personal injury," an exclusion that does not apply in this case.

In this matter, the underlying claims arise from allegedly disparaging statements comparing E.piphany's products to others' products. Thus, the analysis in each of the above-discussed cases derives from an entirely different factual basis. The conclusion that there was no "disparagement" in those cases simply cannot be used to contend that there is none in this.

Similarly, the comment in St. Paul's January 10, 2005 letter that "the alleged statements made by E.piphany are all made in the course of E.piphany's advertising and are, therefore, excluded from coverage under the definition of personal injury in the policy" is so misleading as to suggest that St. Paul is acting in bad faith. The definition of "personal injury" does not exclude "advertising"; it excludes "advertising injury." "Advertising injury" is, of course, covered by the policy. Thus, this particular "exclusion" can have no adverse effect on coverage.

## IV.    CONCLUSION

This claim was originally tendered on or before July 22, 2004. E.piphany's repeated explanations of how, and why, this is a covered claim have been met with boilerplate responses and irrelevant, or actually misleading, analysis. I trust the information and analysis in this letter will be sufficient to convince St. Paul that it must honor its contractual obligations and defend E.piphany from the claims asserted in the *SDI* matter.

Thank you for your cooperation. If you have any questions, please feel free to call.

Sincerely,

Eric R. Little, Esq.

ERL:arm
Enclosure

# EXHIBIT 9

00001-001-07/23/2001-114705.1

 **ST PAUL TRAVELERS**

**St. Paul Travelers**
Claim - Technology
508T
385 Washington Street
St. Paul, MN 55102
651-310-3344 FAX
www.stpaultravelers.com

February 17, 2006

Eric R. Little, Esq.                     **VIA FACSIMILE AND US MAIL**
Gauntlett & Associates                       Fax: 949-553-2050
18400 Von Karman, Suite 300
Irvine, CA 92612

Re: Claim Number:   TE09405602
     Insured:       E.PIPHANY, INC.
     Claimant:     SIGMA DYNAMICS, INC.
     Date of Loss:  TBD

Dear Mr. Little:

Thank you for your letter of September 21, 2005. I have considered the arguments that you make as to why E.piphany believes St. Paul has a duty to defend it in the complaint filed in U.S. District Court by Sigma Dynamics, Inc., (hereinafter "Sigma".) I have also reviewed the claim file, including the complaint and other correspondence on this matter.

Based on my review St. Paul feels that its denial of coverage to E.piphany was and remains appropriate. For the reasons previously stated, as well as those contained herein, St. Paul maintains its position that it has no duty to defend E.piphany in this matter.

As you are aware, the Complaint, Sigma Dynamics, Inc. v E.piphany, Inc., Case Number C04 0569 MJJ, is filed in United States District Court, Northern District of California. The complaint is for False Advertising, Unfair Competition and Unjust Enrichment. Sigma alleges that E.piphany's advertisements that its' products are "all Java" and "fully JZEE" are false and give E.piphany an unfair advantage over competitors. Sigma alleges that the representations, which it alleges are false and misleading, have occurred since August 2002. Sigma alleges damage to its business and good will and a loss of sales and profits. Sigma seeks injunctive relief, accounting for disgorged profits, compensatory and punitive damages and corrective advertisements.

Some of the alleged false and misleading statements Sigma alleges E.piphany made include:

- E.piphany was "the J2EE player in the marketplace;" a 10/17/02 Q302 earnings press release.
- E.piphany had delivered "one of the first end to end J2EE products and product platforms;" a 1/23/03 Q402 earnings conference call.
- "*J2EE compliance.* The Suite is developed on the Java Two, Enterprise Edition, or J2EE, development platform;" E.piphany's 2002 Annual Report.

**EXHIBIT 9**


ST PAUL
TRAVELERS

- E.piphany is "the only full-footprint vendor who actually has a full J2EE architecture, and that doesn't mean that you just, you know, cooperate with, I mean fully embedded from the ground up, all Java, we're the only vendor that has that, and I think we have a couple year lead;" E.piphany's CEO statement on 10/20/03.
- E.piphany E.6 CRM suite provides "a fully integrated and certified one-vendor solution that delivers a true J2EE, standards-based architecture;" 1/14/03 E.piphany press release.
- "E.piphany offers the only full-footprint CRM suite natively built on a service-orientated J2EE architecture;" 8/4/03 E.piphany press release.
- E.piphany's "real-time Interaction Advisor technology and strong analytics, and our J2EE architecture were the key drivers for KLM to choose us as a partner;" 10/03 press release.
- "All E.piphany E.6 solutions are built on the industry's most modern and innovative customer relationship management (CRM) architecture. Based on the Java 2 platform, Enterprise Edition (J2EE), and using a service-orientated architecture, E.6 provides maximum flexibility for faster implementation and integration…." 2/10/04 E.piphany website.
- "E.piphany is the first end-to-end CRM suite designed and built on a unified J2EE-based platform;" 8/20/02 E.piphany press release.

Sigma further alleges that E.piphany's deceptive statements about its products have mislead prominent industry research firms, including Gartner Group and Patricia Seybold Group, to publish research reports which replicate E.piphany's false statements. In turn, E.piphany has misled investors and customers who rely on these reports when making investment and purchasing decisions. (Complaint, paragraph 30.)

Sigma alleges it has been damaged by E.piphany and others statements in the following way:

> The foregoing literally false, deceptive, and misleading representations by E.piphany about its technology have damaged, and continue to present the likelihood of damage, to Sigma Dynamics. E.piphany's literally false, deceptive, and misleading representations have damaged Sigma's market share, sales, profits, business relationships, reputation, and goodwill, and have caused potential purchasers of Sigma's products and services to choose E.piphany's products and services instead of Sigma's. Such representations have caused E.piphany to gain, and Sigma to lose, profits, market share, reputation, and goodwill.
> (Complaint, paragraph 39.)

The Complaint has five causes of action, namely, False Advertising & Unfair Competition, False Advertising, Common Law Unfair Competition, Unfair

**ST PAUL TRAVELERS**

Competition and Unjust Enrichment. Sigma seeks equitable and monetary damages from E.piphany.

I understand that you claim St. Paul has a duty to defend E.piphany because you believe the allegations in the complaint (E.piphany's allegedly disparaging advertisements) disparage Sigma's products and thus constitute either a "personal injury" or an "advertising injury" even though it is undisputed that none of the advertisements identify Sigma or its products. Specifically, your analysis focuses on the allegations in the complaint "that E.piphany claimed the "only" or "first" company with a complete J2EE CRM suite, [and by making said claims] E.piphany is explicitly stating that SDI's competing products are not so. These statements allegedly disparage SDI's products." (p.4, Little 9/21/05 letter). A similar argument made by Mr. Price in his December 16, 2004 letter to Ms. Catherine Curry at St. Paul which I addressed in my January 10, 2005 letter to him.

I respectfully disagree with your analysis for the reasons I have previously stated, which will not be repeated herein, as well as those stated herein. The allegations in the Sigma complaint are insufficient to create a duty to defend E.piphany. E.piphany's statements are not disparaging statements about Sigma's products within the meaning of the advertising injury provision in its policy. This conclusion is supported by the arguments that I have previously made as well as applicable case law.

Numerous courts, many construing false advertising claims, have held in order for coverage to exist, the disparaging statement must identify the underlying plaintiff. *See. e.g., Skylink Technologies, Inc. v. Assurance Co. of America*, 400 F.3d 982, 985 (7th Cir. 2005) (failure of underlying complaint to allege a false comparison between the insured and underlying plaintiff's products resulted in the court finding the suit did not allege disparagement within the meaning of the insurer's advertising injury liability coverage); *Heritage Mt. Ins. Co. v. Advanced Polymer Technology, Inc.* 97 F.Supp.2d 913, 932 (S.D. Ind. 2000) (insured's advertisements never mentioned the underlying plaintiff and never claimed the insureds said anything negative about the plaintiff's products and, therefore, there was no advertising injury coverage); *The Frog, Switch & Manufacturing Co., Inc. v. The Travelers Insurance Co.*, 193 F.3d 742, 748 (3rd Cir. 1999) (false advertising claims did not constitute disparagement of the underlying plaintiff's product); *Winkelvoss Consultants, Inc. v. Federal Insurance Co.*, 199 F. Supp. 1024, 1039-40 (N.D. Ill. 1996) ("there is nothing in the complaint to suggest that [the insured] said anything at all about [the underlying plaintiff] – let alone anything negative and misleading – or did anything other than promote its own product."); *Winkelvoss Consultants, Inv. v. Federal Insurance Co.*, 11 F.Supp.2d 995,999 (N.D. Ill. 1998) (where underlying complaint alleged insured specifically made false statements about the underlying plaintiff, coverage was implicated); *Zurich Ins. Co. v. Sunclipse, Inc.*, 85 F.Supp.2d 842, 847, 855-56 (N.D. Ill. 2000) (although the insured was alleged to have treated the plaintiff's original product unfairly, the plaintiff did not allege that the insured made false or misleading statements about the plaintiff's products and, therefore, there was no coverage); *Microtec Research, Inc. v. Nationwide Mut. Ins. Co.*, 40 F.3d 968, 970 (9th Cir. 1994) ("The complaint alleged that Microtec passed off code created by Green Hills [the

ST PAUL
TRAVELERS

underlying plaintiff] as though Microtec had written it, not that Microtec made disparaging statements about Green Hills in its advertisements."); *Superperformance International, Inc. v. Hartford Casualty Ins. Co.*, 332 F.3d 215, 223-24 (4th Cir. 2003) (claims of products "disparagement" and "false advertising" did not fall within definition of personal and advertising injury "where the complaint failed to allege disparagement of [the underlying plaintiff's] products"); *U.S. Test, Inc. v. NDE Environmental Corp.*, 196 F.3d 1376, 1382 (Fed. Cir. 1999) (underlying counter-plaintiff alleged that the insured improperly solicited customers by claiming that its allegedly infringing product did not infringe the counter-plaintiff's products; the court found the counter-plaintiff's allegations were "legally inadequate to constitute disparagement, as there was no allegation that [the insured] falsely denigrated [the counter-plaintiff's] products").

In *Advanced Polymer*, for example, the Southern District of Indiana considered whether false advertising claims fell within the disparagement offense, "oral or written publication of material that…disparages a person's or organization's goods, products or services." *Advanced Polymer*, 97 F.Supp.2d at 931. The court first recited several definitions of disparagement, and stated it would look to the underlying plaintiff's allegations to determine if it alleged "that [the insured] denigrated, discredited or belittled [the underlying plaintiff's] products in the course of advertising." *Id.* at 932. The court found the underlying plaintiff only alleged the insured's use of the phrase "patent pending" in its advertisements clouded the underlying plaintiff's ownership of the invention. The court found this was deficient, stating:

> Importantly, Environ [the underlying plaintiff] never contends that APT's [the insured's] advertisement mention Environ, compare the products of the respective companies, or discredit or denigrate Environ's piping products. Nor does Environ claim that APT advertised its product under Environ's name or label. In fact, APT's advertisements never refer to Environ or any other competitor. While Environ surely complains that APT improperly made off with its product, Environ simply fails to claim that APT said anything negative about its piping, which negative connotation is, after all, the essence of disparagement. The insured's lack of any direct reference to a competitor's goods or products repeatedly has compelled courts to find that the underlying plaintiff has not alleged an advertising injury under this disparagement offense. [citing cases].

*Id.* at 932.

Similarly, in the Third Circuit *Frog, Switch* decision, the insured argued the underlying complaint's Lanham Act claims fell within the disparagement offense of advertising injury coverage. *Frog, Switch*, 193 F.3d at 748. The court relied on an Eastern District of Pennsylvania decision, *DecisionOne v. ITT Hartford Insurance Group*, 942 F. Supp. 1038 (E.D. Penn. 1996), a case that you have cited, to hold there

**ST PAUL
TRAVELERS**

was no coverage. In contrasting *DecisionOne* with the allegations against the insured, Frog, the court stated:

> As the insurers note, however, in *DecisionOne* the underlying complaint alleged that the insured made derogatory statements about the <u>underlying plaintiff's own products,</u> thus stating a cause of action for "disparagement," which was covered as advertising injury by a separate part of the standard policy. By contrast, nothing in Amsco's complaint alleges that Frog said anything disparaging about Amsco's products.

*Frog, Switch*, 193 F.3d at 748 (emphasis supplied).

Last year the Seventh Circuit held a false advertising suit did not allege disparagement under the insurer's advertising injury liability coverage. *Skylink* 400 F.3d 982 (7th Cir. March 11, 2005). In *Skylink*, the underlying plaintiff, Chamberlain, alleged Skylink sold a transmitter and key pad used to open garage doors outfitted with Chamberlain's rolling code technology, but that Skylink's product did not work as advertised. Chamberlain sued Skylink claiming Skylink's advertisements were false and misleading because Skylink's transmitters were not actually compatible with Chamberlain's rolling code technology, as claimed on the packaging of Skylink's products. *Id.* at 984.

Skylink argued Chamberlain's suit alleged disparagement through Skylink's promotion of its products as "compatible" with Chamberlain's rolling code technology. *Id.* Skylink argued that if the product did not work as anticipated, customers would blame Chamberlain and Chamberlain's reputation would be diminished. The court held that what Chamberlain was really alleging was that Skylink's products did not live up to the promise of compatibility or that Skylink's products failed to conform with the statement of performance on the packaging.

Skylink further argued Chamberlain complained Skylink's packaging amounted to a "false comparison" between Chamberlain and Skylink and that this conduct constituted disparagement, *Id.* at 985. The court disagreed:

> …Skylink's statement on its packages that its products were compatible with Chamberlain's rolling code technology was not really a comparison. In a clear case of disparagement resulting from a false comparison – imagine Skylink ran a series of print ads that said "Burglars prefer Chamberlain transmitters" – the damage is done by the ad itself. That is, Chamberlain's reputation had been hurt as soon as a potential customer sees the ad. By contrast, Chamberlain's reputation would not be affected by potential customers seeing the packaging for Skylink's Model 39 universal transmitter or Model 89 keypad, which said only that the product was compatible with

**ST PAUL
TRAVELERS**

Chamberlain's rolling code technology. Chamberlain's suit
alleges damages to its reputation not because of Skylink's
packaging but because the Skylink products did not utilize
the rolling code technology. Thus, Chamberlain's suit does
not allege disparagement.

Furthermore, this month the U.S. District Court for the Western District of
Wisconsin, in the case of *Acme United Corporation v. St. Paul Fire and Marine
Insurance Company* (a copy of the opinion is attached hereto) addressed facts nearly
identical to the facts in the E.piphany matter and concluded that the complained of
activity did not constitute an advertising injury offense. The facts of the *Acme* case
are as follows:

On or about June 14, 2004, Fiskars Brands, Inc., one of plaintiff's primary
competitors in the scissors industry, filed a lawsuit against plaintiff in
federal court in this District. Fiskars asserted two causes of action against
plaintiff. The first cause of action was for false advertising in interstate
commerce in violation of the Lanham Act and the second cause of action
was for false advertising in violation of Wis. Stat. § 100.18. Fiskars's
complaint against plaintiff contained the following allegations:

7. Acme has caused certain of its scissors for adults and children
to enter Commerce with false or misleading descriptions and
representations in that Acme advertises on certain scissors and
product packaging for certain scissors that they are "Titanium" or
"Titanium Bonded," have a titanium cutting edge, that they are "3
times harder than stainless steel," that they "stays (sic) sharper
longer" are "non-corrosive"…that the "blades stay sharp,
longer"…and that "Acme uses a process that bonds titanium to a
stainless steel core to produce a sharper, more durable and longer
lasting cutting edge."

8. Acme has caused certain of its paper trimmers to enter
commerce with false or misleading descriptions and
representations in that Acme advertises on certain paper trimmers
and the product packaging for certain paper trimmers that they are
"Titanium" or "Titanium Bonded," that they are "Titanium bonded
3X harder than stainless steel…so blades stay sharper, <u>longer</u>,"
have a titanium cutting edge, that they have "Titanium bonded
blades stay sharper, longer" and have "Trimmer Blades Feature
Titanium…bonded to a stainless steel core, resulting in a surface
that is sharper, more durable and 3 times harder than stainless
steel!" and that "Titanium-bonded blades are non-corrosive and
resistant to adhesive."

9. The advertisements described in paragraphs 7 and 8 are false
and misleading descriptions of fact and false and misleading

**ST PAUL
TRAVELERS**

representations in violation of 15 U.S.C. 1125 [the Lanham Act].
The scissors and paper trimmer's blades have only a negligible and
immaterial amount of titanium, which is not on the cutting edge,
and does not make the scissors harder, sharper, more durable, or
longer lasting.

10. The Scissors False Advertisements and the Trimmers False
Advertisements were intended to and did deceive a substantial
segment of the target audience to incorrectly believe that they were
purchasing scissors and paper trimmers made from or
incorporating a non-negligible amount of titanium, with cutting
surfaces made from titanium and/or blades made from a non-
negligible amount of titanium which were three times stronger than
blades made from stainless steel and that because of the titanium,
the scissor blades and paper trimmer blades were harder, sharper
and/or more durable or long lasting.  The false advertisements
were calculated and likely to influence purchasers' decision on
whether to purchase scissors and paper trimmers manufactured by
Fiskars, or scissors and paper trimmers manufactured by Acme.

11. Acme knew or by the exercise of reasonable care should have
known that the False Advertisements were untrue at the time they
were made because the presence or bonding of titanium has a
negligible, if any, effect on the performance of the scissors and the
paper trimmer blades.

12. Acme made the Scissors False Advertisement and Trimmer
False Advertisements intending to divert trade away from Fiskars,
which has occurred.

13. Because of the Scissors False Advertisements and Trimmer
False Advertisements, Fiskars has suffered and will continue to
suffer a loss of sales and profits that it would have otherwise made.

17. The Scissors False Advertisements and Trimmer False
Advertisements contain statements and representations as to the
condition of the scissors and paper trimmers which are untrue,
deceptive and misleading [in violation of Wis. Stat. § 100.18].

The Fiskars complaint does not allege that plaintiff's advertisements made
any reference to Fiskars.

*(Acme, pp. 4-6)*

The court went on to note the following:

Fiskars alleged in its complaint that plaintiff's advertisements stated that,
because plaintiff's scissors and trimmers contained titanium, they were

**ST PAUL
TRAVELERS**

"sharper, more durable and 3 times harder than stainless steel." Although Fiskars labeled the legal issue as "false advertising," the court must look beyond Fiskars's legal theory to the actual allegations of Fiskars's complaint to determine whether the complaint alleges facts that, if proven, would show plaintiff had committed an offense covered by the insurance policy. Fiskars alleged in its complaint not only that plaintiff made false statements about the contents of plaintiff's products ("the scissors and paper trimmer blades have only a negligible and immaterial amount of titanium, which is not on the cutting edge"), but also that plaintiff falsely portrayed its products are being better than stainless steel products ("...does not make the scissors harder, sharper, more durable or longer lasting"). In effect, the latter statement is an allegation that plaintiff's advertisements discredited stainless steel scissors and cutters.

Although the Fiskars complaint does not state so explicitly (and plaintiff has not introduced independent facts to prove it), it is reasonable to infer that Fiskars sells stainless steel scissors and trimmers. Fiskars made allegations such as "[t]he false advertisements were calculated and likely to influence purchasers' decision on whether to purchase scissors and paper trimmers manufactured by Fiskars, or scissors and paper trimmers manufactured by Acme" and "Acme made the Scissors False Advertisement and Trimmer False Advertisements intending to divert trade away from Fiskars, which as occurred." Reading these allegations in context, and giving the benefit of the doubt to the insured, as I must, the logical inference is that Fiskars sells stainless steel scissors and trimmers. Accordingly, the next question is whether defendant had a duty to defend plaintiff against a complaint that alleged that plaintiff's advertisements discredited stainless steel products such as the one Fiskars sold.

*(Acme, pp. 10-11.)*

The court in *Acme* concluded that St. Paul Fire & Marine had no duty to defend Acme. It reasoned as follows:

...[T]he advertisements do not constitute an advertising injury offense because, although they disparaged a product (stainless steel scissors and cutters), they did not disparage the "business, premises, products, services, work, or completed work of others." Although the parties dispute whether, to constitute an advertising injury offense, a disparaging advertisement must name another brand, the parties' disagreement does not render the clause "business, premises, products, services, work, or completed work of others" ambiguous. There is only one reasonable reading of the policy's definition of advertising injury offense and it is that the disparaging advertisements must name another brand. For an advertisement to disparage the product of another entity, that product must be identified as a product of the other entity. The words "of others" included at the end of the phrase "business, premises, products, services, work, or completed work of others" make it clear that the policy's



> prohibition is against disparaging another entity's products, not against disparaging other types, or classes, of products. Although plaintiff's advertisements disparaged stainless steel scissors and trimmers as a class of products, they did not disparage *Fiskars's* stainless steel scissors and trimmers.

*(Acme, pp. 14-15.)*

In conclusion, *Acme* and the other cases cited above support St. Paul's position that it has no duty to defend E.piphany in this matter. The facts and allegations do not constitute either a "personal injury" or an "advertising injury" offense under the St. Paul policy. Therefore, St. Paul respectfully denies E.piphany's request for a defense and indemnification in this matter.

In accordance with Section 2695.7(b)3 of the California Insurance Regulations, if you disagree with our determination concerning coverage for this claim, you may have this matter reviewed by the California Department of Insurance, Claims Service Bureau, 300 S. Spring Street, 11th floor, Los Angeles, California 90013, telephone (800) 927-4357 or (213) 897-8921.

The above information is advisory only, and is not intended to either encourage or discourage you from contacting the California Department of Insurance. If you elect to send any correspondence regarding our position concerning coverage for this claim, we ask that you please forward us copies of all such correspondence.

St. Paul's coverage determination is based on the information made available to date. If you have any additional information which you believe may affect our determination, please provide us with this information at your earliest opportunity.

Thank you for your cooperation. Please call me at 651-310-8561 if you have any questions.

Sincerely,

**ST PAUL FIRE & MARINE INSURANCE COMPANY**

Dale J. Evensen, Esq.
Technology Claim Attorney

cc:     Eric Schuldt
        E.piphany, Inc.
        1900 S. Norfolk Street, Suite 310
        San Mateo, CA  94403

        Mary Nicolini
        AON Risk Technology Brokers
        199 Fremont, Street, Suite 1400
        San Francisco, CA  94105