**GAUNTLETT & ASSOCIATES**
David A. Gauntlett (SBN 96399)
James A. Lowe (SBN 215383)
Christopher Lai (SBN 249425)
18400 Von Karman Avenue, Suite 300
Irvine, California 92612
Telephone: (949) 553-1010
Facsimile: (949) 553-2050
jal@gauntlettlaw.com
cl@gauntlettlaw.com

Attorneys for Plaintiff
E.PIPHANY, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| E.PIPHANY, INC., a California corporation, | Case No.: CV-08-2621-PVT |
| Plaintiff, | Hon. Patricia V. Trumbull |
| vs. | **DECLARATION OF RYAN J. PADDEN IN SUPPORT OF PLAINTIFF E.PIPHANY, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ST. PAUL FIRE & MARINE INSURANCE COMPANY'S DUTY TO DEFEND AND BREACH OF ITS DUTY TO DEFEND** |
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, a Minnesota corporation, | |
| Defendant. | Date:       July 21, 2008<br>Time:       9:00 a.m.<br>Ctrm:       5, 4th Floor |

I, RYAN J. PADDEN, declare:

1.     I am a counsel with the law firm of O'Melveny & Myers LLP, located at Embarcadero Center West, 275 Battery Street, San Francisco, CA 94111. O'Melveny & Myers was counsel of record for Epiphany, Inc. ("Epiphany") in the cases styled (1) *Sigma Dynamics, Inc. v. E.piphany, Inc.*, case no. CV-04-0569-MJJ, U.S. District Court for the Northern District of California and (2) *E.piphany, Inc. v. Sigma Dynamics, Inc.*, et al., case no. CIV-439133, Superior Court of the State of California, County of San Mateo. I know the facts set forth in this declaration to be true and correct based on my personal knowledge thereof and, if called to testify, I could and would testify competently thereto.

2.     Attached as **Exhibit "1"** is a true and correct copy of the first amended complaint filed on February 10, 2004 by Sigma Dynamics, Inc. ("Sigma") against Epiphany in the case styled as *Sigma Dynamics, Inc. v. E.piphany, Inc.*, Case no. CV-04-0569-MJJ, U.S. District Court for the Northern District of California.

3.     Attached as **Exhibit "11"** is a true and correct copy of excerpts of the deposition testimony of Michael J. A. Berry given at 101 Jefferson Dr., Menlo Park, CA 94025 on May 13, 2005 before and recorded by Jane H. Stuller, a certified shorthand reporter in the case of *E.piphany, Inc. v. Sigma Dynamics, Inc.*, et al., case no. CIV-439133.

4.     Attached as **Exhibit "12"** is a true and correct copy of excerpts of the deposition testimony of Donald Dureau given at the offices of Perkins Coie, LLP, 180 Townsend Street, San Francisco, CA 94107 on February 16, 2005 before and recorded by Joanne Ichiki, a certified shorthand reporter in the case of *E.piphany, Inc. v. Sigma Dynamics, Inc.*, et al., case no. CIV-439133. I appeared at and defended the deposition.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:         June 11, 2008

Ryan J. Padden

**EXHIBIT 1**

1  KENNETH B. WILSON, State Bar No. 130009
   DAVID R. BURTT, State Bar No. 201220
2  ESHA BANDYOPADHYAY, State Bar No. 212249
   PERKINS COIE LLP
3  180 Townsend Street, 3rd Floor
   San Francisco, California 94107-1909
4  Telephone: (415) 344-7000
   Facsimile: (415) 344-7050
5
   Attorneys for Plaintiff
6  SIGMA DYNAMICS, INC.

7               UNITED STATES DISTRICT COURT

8              NORTHERN DISTRICT OF CALIFORNIA

9                 SAN FRANCISCO DIVISION

10

11 SIGMA DYNAMICS, INC., a Delaware          Case No: 04-0569 MJJ
   corporation,
12                                           **FIRST AMENDED COMPLAINT FOR:**
                      Plaintiff,
13                                           **(1) FALSE ADVERTISING & UNFAIR**
           v.                                    **COMPETITION UNDER 15 U.S.C.**
14                                               **§ 1125(a);**
   E.PIPHANY, INC., a Delaware corporation,  **(2) FALSE ADVERTISING UNDER**
15                                               **BUS. & PROF. CODE § 17500; and**
                      Defendant.             **(3) UNFAIR COMPETITION UNDER**
16                                               **BUS. & PROF. CODE § 17200.**

17                                           **DEMAND FOR JURY TRIAL**

18         Plaintiff Sigma Dynamics, Inc. ("Sigma Dynamics" or "Sigma") hereby alleges for its First

19 Amended Complaint against Defendant E.piphany, Inc. ("E.piphany"), on personal knowledge as

20 to its own acts and on information and belief as to the actions of others, as follows:

21                          **PRELIMINARY STATEMENT**

22         1.     This is an action for false advertising and unfair competition aimed at redressing

23 E.piphany's misrepresentations about its technology to the public, customers, potential customers,

24 and prominent industry analysts. Sigma Dynamics and E.piphany are direct competitors in the

25 market for software products that enable businesses to more efficiently manage and optimize their

26 customer interactions. One important differentiator between competing products in this market is

27 whether the software is written in Java and is fully compliant with J2EE application server

28 technology, since those features provide businesses with significant and measurable benefits when

1    compared with older proprietary and non-standards based software (e.g., software written in C++).

2    Since at least mid-2002, E.piphany has been falsely advertising its product suite as "all Java" and

3    "fully J2EE." E.piphany's products are not "all Java" or "fully J2EE," and E.piphany's

4    misrepresentations about the underlying architecture and implementation of its products have

5    given it an unfair and undeserved advantage over competitors, some of which do offer "all Java"

6    and "fully J2EE" software solutions. E.piphany's misleading statements have caused prominent

7    industry and financial analysts to publish unfair product comparisons and reviews, which have

8    compounded the confusion caused by E.piphany's direct statements to customers and prospective

9    customers and led to unwise purchasing decisions by IT departments worldwide. Despite recently

10   admitting to Sigma that its directly competitive Interaction Advisor product is written in C++ and

11   is not "all Java" or "fully J2EE," E.piphany has rebuffed Sigma's attempts to resolve this dispute

12   informally. Thus, Sigma has been forced to file this litigation to level the playing field in the

13   market for customer relationship management software.

14                                       **THE PARTIES**

15          2.      Sigma Dynamics is a Delaware corporation with its principal place of business in

16   Foster City, California. Sigma creates "business process intelligence" software that continuously

17   observes and improves core business processes in terms of costs, revenue generation, and other

18   business metrics. Sigma is, and at all relevant time was, qualified to do business in California.

19          3.      E.piphany is a Delaware corporation with its principal place of business in San

20   Mateo, California. E.piphany is in the business of providing customer relationship management

21   ("CRM") software to companies in retail, financial services, communications, technology, travel,

22   and other industries.

23                       **JURISDICTION AND VENUE ALLEGATIONS**

24          4.      This Court has jurisdiction over the subject matter of this action pursuant to

25   28 U.S.C. §§ 1331 and 1338, 15 U.S.C. § 1121, and this Court's supplemental jurisdiction under

26   28 U.S.C. § 1367.

27

28

                                            - 2 -

5.    The claims stated in this action arise under 15 U.S.C. §§ 1125(a) and California Business & Professions Code §§ 17200 *et seq.* and §§ 17500 *et seq.*

6.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred herein.

## INTRA DISTRICT ASSIGNMENT

7.    This action is properly filed in the San Francisco Division of the United States District Court for the Northern District of California pursuant to Civil Local Rule 3-2(d) because a substantial part of the events giving rise to the claims set forth in this Complaint occurred in San Mateo County.

## STATEMENT OF RELEVANT FACTS

### *The Parties*

8.    Founded in August 2002, Sigma Dynamics provides enterprise software products that allow businesses to make better decisions in real-time at specific points in enterprise business processes.  Businesses can use these products to solve a wide range of CRM and non-CRM business problems; for example, in providing cross-selling offers or content recommendations to customers through various customer contact channels.

9.    Founded in 1996, E.piphany develops, markets, and sells a series of CRM software products. E.piphany claims that "[m]ore than 460 companies, including nearly 40 of the Fortune 100, use E.piphany software products to enhance their customers' experiences while, at the same time, realizing the companies' business objectives."

10.    E.piphany and Sigma Dynamics are direct competitors for specific products within their respective product lines.

11.    In the CRM marketplace, E.piphany has struggled to compete against much larger CRM providers such as Siebel Systems, Oracle, PeopleSoft, and SAP, and has seen industry recognition shift to newer CRM providers such as Salesforce.com.  In recent years, E.piphany has sustained hundreds of millions of dollars in operating losses, significantly downsized its workforce, and closed or downsized the bulk of its international operations.  It is within this

- 3 -

FIRST AMENDED COMPLAINT FOR FALSE
ADVERTISING AND UNFAIR COMPETITION
Case No. C 04-0569 MJJ

business context that E.piphany has deliberately engaged in the pattern of anti-competitive actions further detailed in this complaint.

### The Technology

12.     Developed by Sun Microsystems, J2EE (which stands for Java 2 Platform, Enterprise Edition) is a Java-based set of coordinated specifications and practices that together enable solutions for developing, deploying, and managing multi-tier, server-centric applications. J2EE is widely accepted to be a modern and standards-based platform that provides specific and tangible benefits to companies, including a common programming language environment (Java), standard system management capabilities, reuse of standards-based connectors, and a standard approach to clustering and failover. Many large enterprises have corporate information technology ("IT") purchasing criteria that specify or favor applications that are fully compliant with J2EE and that run on standard J2EE application server environments. For this reason, many enterprise software companies have based their newer products on J2EE and have rewritten older software products to run as Java applications on standard J2EE application servers.

13.     While software products written in the C++ programming language may communicate or coexist with J2EE applications, those products are not themselves considered to be J2EE applications since they are not written in Java, do not leverage common underlying J2EE services, and would not pass J2EE application certification criteria. E.piphany recognizes this distinction; indeed, Phil Fernandez, E.piphany's President and Chief Operating Officer, has publicly stated the following:

> "I have seen vendors quoted as saying they offer J2EE products, but in reality their software is written in C++. Obviously, a product that is not even written in Java cannot be J2EE. But we find ourselves fighting a losing battle, because claims like this are given legitimacy in press and analyst reports."

### E.piphany's Unlawful Conduct

14.     E.piphany advertises and promotes its products and services in interstate commerce through, among other media, industry-sponsored conferences, press releases, Internet advertising, and sales and customer presentations.

- 4 -

15.     Like every major player in the industry, E.piphany understands the importance that the opinions of industry analysts and financial analysts have in the buying process for enterprise software. A recent survey of IT departments conducted by a leading market research firm confirms that industry and financial analyst reports are the two main sources of information that influence customers' perceptions about technology companies and their products. E.piphany therefore advertises and promotes its product through the statements it makes to industry and financial analysts about its software, and often republishes their reports to further mislead potential customers' purchasing decisions.

16.     Using every channel at its disposal, E.piphany has made, and continues to make, false and misleading statements about its products and their performance. For example, at some point in 2002, E.piphany began advertising that its product suite is "all Java" and "fully J2EE."

17.     E.piphany has made its claim to be "all Java" and "fully J2EE" a core part of its positioning in the market, and claims a competitive advantage over other software vendors based on that alleged differentiator.

18.     Despite making public claims, since at least August 2002, that it "is the first full-suite CRM vendor to market a complete product suite built on J2EE" and that it has released "the only component-based, fully-J2EE complete CRM suite available," E.piphany's product suite has never been "all Java" nor "fully J2EE." Since mid-2002, key products in E.piphany's "product suite," including without limitation Interaction Advisor, have not been "all Java" or "fully J2EE."

19.     Interaction Advisor is E.piphany's real-time analytics product line, and is a significant driver of the company's revenues as well as its industry recognition and differentiation. E.piphany's Chief Executive Officer, Karen Richardson, has called Interaction Advisor the company's "Trojan horse" into large customer accounts, and claimed the product line is "truly differentiated" with "no competitors." During Q403 and into Q104, E.piphany was actively recruiting software development engineers to work on "major features" of "new releases" for its Interaction Advisor product. According to a job posting carried on E.piphany's Website, the only programming skill required for these Interaction Advisor positions was "fluency in C++."

- 5 -

20.    Indeed, in recent correspondence to Sigma Dynamics, E.piphany's Chief Executive Officer confirmed that E.piphany's CRM product suite is not written in "all Java," and further acknowledged that parts of at least one of the components of its product suite are still written in C++ "for important performance reasons."

E.piphany's False and Misleading Statement:  Earnings Calls and Earnings Releases

21.    E.piphany conducts quarterly earnings conference calls where any member of the public, including customers and potential customers, can attend by simply listening in on the call. E.piphany regularly announces these conference calls in press releases, promotes them on the company Website, and makes them available to listeners via both audio conferences and Webcasts. Many customers and prospective customers for E.piphany's (and Sigma's) software listen in on these calls, during which E.piphany's senior management team discusses E.piphany's development efforts, market differentiators, and business results.  E.piphany knows that statements made about its products on these calls directly or indirectly influence the software purchasing decisions of large IT departments.

22.    E.piphany also knows that financial analysts listen to these calls and closely follow E.piphany's earnings press releases, and then publish reports assessing E.piphany's financial well-being and the viability of E.piphany's technology, often comparing it with technology available from competitors.  As a second-tier CRM vendor that has struggled to gain traction against larger competitors like Siebel and SAP, E.piphany knows that prospective customers routinely rely on financial analyst opinions and reports as one source to better understand E.piphany's financial viability as a company and their strategic viability as an enterprise software provider.  E.piphany uses these occasions as events to promote and advertise its products.

23.    On October 17, 2002, E.piphany issued its Q302 earnings press release, in which then-Chief Executive Officer Roger Siboni was quoted as stating, "The launch of E.6 Service in August completed the E.6 Platform, the only component-based, fully-J2EE complete CRM suite available."  During E.piphany's Q302 earnings conference call, held the same day, Mr. Siboni amplified this false and misleading claim by stating that E.piphany was "the J2EE player in the

- 6 -

1   marketplace." Mr. Siboni made these statements, at least in part, for the purpose of promoting and

2   advertising E.piphany's software.  Sigma is informed and believes that E.piphany made the same

3   or similar statements directly to prospective customers in an effort to market and sell Epiphany's

4   product suite.

5        24.    On January 23, 2003, during E.piphany's Q402 earnings conference call, Mr.

6   Siboni claimed that E.piphany had delivered "one of the first end to end J2EE products and

7   product platforms."  Mr. Siboni made this statement, at least in part, for the purpose of promoting

8   and advertising E.piphany's software.  Sigma is informed and believes that E.piphany made the

9   same or similar statements directly to prospective customers in an effort to market and sell

10  Epiphany's product suite.

11       25.    In March 2003, E.piphany released its 2002 Annual Report (Form 10-K), which

12  stated the following:

13
> "*J2EE compliance.* The E.6 Suite is developed on the Java Two, Enterprise Edition, or
14  J2EE, development platform. This industry standard set of development specifications
     leverages the strengths of the Java programming language to enable software applications
15  that are easier to develop, configure and integrate with our customers' existing systems."

16  E.piphany made this statement, at least in part, for the purpose of promoting and advertising

17  E.piphany's software.  Sigma is informed and believes that E.piphany made the same or similar

18  statements directly to prospective customers in an effort to market and sell Epiphany's product

19  suite.

20       26.    On October 20, 2003, during E.piphany's Q303 earnings conference call, Chief

21  Executive Officer Karen Richardson recapped E.piphany's public positioning around Java and

22  J2EE, and its importance to the marketplace, by claiming that E.piphany is "the only full-footprint

23  vendor who actually has a full J2EE architecture, and that doesn't mean that you just, you know,

24  cooperate with, I mean fully embedded from the ground up, all Java, we're the only vendor that

25  has that, and I think we have a couple year lead." Ms. Richardson's comments were in response to

26  a question from Gary Abbott at Merriman Curhan Ford, who later published an investor research

27  report on E.piphany (dated January 30, 2004) that stated "[E.piphany's] technical architecture is

28  fully J2EE-compliant and runs on standard commercial application server products.  This helps

- 7 -

FIRST AMENDED COMPLAINT FOR FALSE
ADVERTISING AND UNFAIR COMPETITION
Case No. C 04-0569 MJJ

differentiate Epiphany and satisfies an increasingly common customer requirement that many of its competitors do not." Ms. Richardson made this statement, comparing E.piphany's software to that of the competition, at least in part for the purpose of promoting and advertising E.piphany's software. Sigma is informed and believes that E.piphany made the same or similar statements directly to prospective customers in an effort to market and sell Epiphany's product suite.

27.    On January 9, 2004, at the Sixth Annual Needham Growth Conference, Ms. Richardson stated the following:

> "[E.piphany] spent about $100 million dollars rewriting the entire E.piphany platform around a J2EE architecture and the last year has all been about shipping that and selling the first, you know, couple dozen customers and talking about those references to people like yourselves . . . [We] built all of our applications as component Lego building blocks on top of J2EE, and they can be assembled in blended ways . . ."

Ms. Richardson made this statement, at least in part, for the purpose of promoting and advertising E.piphany's software. Sigma is informed and believes that E.piphany made the same or similar statements directly to prospective customers in an effort to market and sell Epiphany's product suite.

### E.piphany's False and Misleading Statements:  Press Releases

28.    On January 14, 2003, E.piphany published a press release entitled *E.piphany Advances Relationship with IBM by Delivering Open-Standards CRM*, which claimed that the E.piphany E.6 CRM suite provides "a fully integrated and certified one-vendor solution that delivers a true J2EE, standards-based architecture." Sigma is informed and believes that E.piphany made the same or similar statements directly to prospective customers in an effort to market and sell Epiphany's product suite.

29.    On August 4, 2003, E.piphany published a press release entitled *E.piphany Announces Support of BEA Weblogic Platform 8.1*, which claimed that "E.piphany offers the only full-footprint CRM suite natively built on a service-oriented J2EE architecture." Sigma is informed and believes that E.piphany made the same or similar statements directly to prospective customers in an effort to market and sell Epiphany's product suite.

- 8 -

1    30.    In October 2003, E.piphany published a press release entitled *KLM Selects*

2    *E.piphany Customer Relationship Management Software Solution*, which claimed that E.piphany's

3    "real-time Interaction Advisor technology and strong analytics, and our J2EE architecture were the

4    key drivers for KLM to choose us as a partner." Sigma is informed and believes that E.piphany

5    made the same or similar statements directly to prospective customers in an effort to market and

6    sell Epiphany's product suite.

7    E.piphany's False and Misleading Statements:  E.piphany's Website

8    31.    At least as late as June 16, 2004, E.piphany's Website included the following text:

9
     "All E.piphany E.6 solutions are built on the industry's most modern and innovative
10   customer relationship management (CRM) architecture. Based on the Java 2 platform,
     Enterprise Edition (J2EE), and using a service-oriented architecture, E.6 provides
11   maximum flexibility for faster implementation and integration, and allows IT organizations
     to reuse skills for increased productivity and lower overall costs. The E.6 architecture lets
12   organizations take full advantage of the scalability, reliability, and integration features built
     into industry-standard J2EE application servers."
13   Sigma is informed and believes that E.piphany made the same or similar statements directly to

14   prospective customers in an effort to market and sell Epiphany's product suite.

15   32.    At least as late as February 10, 2004, E.piphany's Website also included the

16   following text:

17
     "The same technology that delivers E.piphany's superior scalability – namely full support
18   for standard J2EE application servers and the ability to be deployed in a stateless
     environment – also ensures that E.piphany applications are consistently available to users
19   in your enterprise, even in the event of server failure."

20   Sigma is informed and believes that E.piphany made the same or similar statements directly to

21   prospective customers in an effort to market and sell Epiphany's product suite.

22   E.piphany's False and Misleading Statements:  Industry Analysts and Research Firms

23   33.    E.piphany has also made false statements about its products to industry analysts for

24   the purpose of influencing customers' and prospective customers' purchasing decisions.

25   E.piphany's deceptive statements about its products have mislead prominent industry research

26   firms, including Gartner Group and Patricia Seybold Group, to publish research reports which

27   replicate E.piphany's false statements.

28

- 9 -

34.    To further market and promote its products, E.piphany republishes many of the industry analysts' misleading reports, further misleading customers and prospective customers who rely on these reports and on E.piphany's own statements when making purchasing decisions.

35.    In August 2002, industry analyst Patricia Seybold Group made the following statement in its publication entitled *Comparing CRM Architectures*:

> "E.6 is the top ranked infrastructure. E.piphany made a major R&D investment in architecture for E.6, integrating a diverse set of in-house-developed and acquired applications, implementing them consistently in Java, and deploying them on a J2EE infrastructure. This infrastructure has no proprietary elements and no legacy technology to accommodate. E.6 has the cleanest infrastructure of the five architectures that we evaluated. The firm has done a very nice job."

Patricia Seybold Group based the above statement on information that E.piphany provided to it for the purpose of advertising and promoting its software. Rather than correct these false and misleading claims, E.piphany issued a worldwide press release touting the report on August 20, 2002, entitled *Patricia Seybold Group Designates E.piphany E.6 as the Best CRM Architecture*. In the press release, E.piphany also stated that "E.piphany E.6 is the first end-to-end CRM suite designed and built on a unified J2EE-based platform." E.piphany republished and touted Patricia Seybold's misleading product review (which was based on E.piphany's misleading statements) for the purpose of advertising and promoting E.piphany's software. E.piphany has made this press release publicly available since its origination and it remains on E.piphany's Website today. Sigma is informed and believes that E.piphany made the same or similar statements directly to prospective customers in an effort to market and sell Epiphany's product suite.

36.    In March 2003, in a publication entitled *E.piphany E.6: How E.piphany's CRM Suite Stacks Up against Our Framework for Evaluating Multi-Channel CRM Solutions*, Patricia Seybold Group stated that E.piphany's product suite is "[b]uilt of collections of EJBs and BIOs components that are specified in Java." Patricia Seybold Group based the above statement on information that E.piphany provided to it for the purpose of advertising and promoting its software. Sigma is informed and believes that E.piphany provided the same or similar information directly to prospective customers in an effort to market and sell Epiphany's product suite.

- 10 -

1    E.piphany makes this publication freely available for download on its Website for the purpose of

2    advertising and promoting E.piphany's software.

3        37.    In July 2003, Gartner Group made the following statement in its publication

4    entitled *The Gartner CRM Software Vendor Guide: 2003*:

5        "*E.piphany*: This vendor continues to experience strong differentiation through its
         real-time recommendation engine. The E6 rewrite of the application code base into
6        J2EE appeals to the many enterprises pursuing a Web services architecture."

7    Gartner Group based the above statement on information that E.piphany provided to it for the

8    purpose of advertising and promoting its software. Sigma is informed and believes that E.piphany

9    provided the same or similar information directly to prospective customers in an effort to market

10   and sell Epiphany's product suite.

11       38.    In September 2003, Gartner Group published a report entitled *CRM Applications –*

12   *An Architectural Review of Key Vendors* which included a diagram that shows E.piphany's

13   architecture as being all Java and J2EE. The report further states that "E.piphany's current release

14   establishes a full suite under common tools and compatibility with several J2EE-compliant

15   commercial application servers." Gartner Group based the above diagram and statement on

16   information that E.piphany provided to it for the purpose of advertising and promoting its

17   software. Sigma is informed and believes that E.piphany provided the same or similar information

18   directly to prospective customers in an effort to market and sell Epiphany's product suite.

19       39.    Customers and potential customers for E.piphany's and Sigma's software products

20   rely on the publications of industry research firms Gartner Group, Patricia Seybold Group, and

21   others in formulating opinions as to which software products to purchase. In fact, in addition to

22   financial analyst reports, industry analyst reports are one of the most influential factors on IT

23   purchasing decisions.

24       40.    As shown above, rather than correct industry research reports that republish

25   E.piphany's false statements regarding its technology, E.piphany cites these misleading reports in

26   press releases, on its Website, and in other public statements, further compounding the damage.

27   By providing deliberately false and misleading statements about its software to industry analysts,

28

                                                - 11 -

FIRST AMENDED COMPLAINT FOR FALSE
ADVERTISING AND UNFAIR COMPETITION
Case No. C 04-0569 MJJ

1    then bolstering its direct marketing efforts by republishing their inaccurate reports, E.piphany's

2    conduct further perpetuates the "all Java" and "fully J2EE" myths about its software and damages

3    fair competition in the marketplace.

4        41.    E.piphany has made, and continues to make, literally false, misleading, and

5    deceptive representations, both oral and written, regarding its products to industry analysts,

6    financial analysts, and customers and potential customers, including potential Sigma customers.

7        42.    E.piphany's false, deceptive, and misleading representations are material in that

8    they have a natural tendency to influence, or are capable of influencing, purchasing decisions, and

9    they relate to the essential characteristics, quality, and/or nature of competing products and

10   commercial activities, including value, compatibility, interoperability, and quality.

11       43.    The foregoing literally false, deceptive, and misleading representations by

12   E.piphany about its technology have damaged, and continue to present the likelihood of damage,

13   to Sigma Dynamics.  E.piphany's literally false, deceptive, and misleading representations have

14   damaged Sigma's market share, sales, profits, business relationships, reputation, and goodwill, and

15   have caused potential purchasers of Sigma's products and services to choose E.piphany's products

16   and services instead of Sigma's.  Such representations have caused E.piphany to gain, and Sigma

17   to lose, profits, market share, reputation, and goodwill.

18                          **FIRST CAUSE OF ACTION**

19            **(False Advertising & Unfair Competition, 15 U.S.C. § 1125(a))**

20       44.    Sigma Dynamics realleges and incorporates by reference the allegations of

21   paragraphs 1 through 43 of the Complaint as if fully set forth herein.

22       45.    Through its actions as described above, E.piphany has violated the Lanham Act, 15

23   U.S.C. § 1125(a), by using false and misleading descriptions and representations of fact in

24   commercial advertising or promotion in connection with products and services in interstate

25   commerce, which descriptions and representations misrepresent the nature and qualities of

26   E.piphany's goods, services, or commercial activities, all to the damage of Sigma Dynamics.

27

28

- 12 -

FIRST AMENDED COMPLAINT FOR FALSE
ADVERTISING AND UNFAIR COMPETITION
Case No. C 04-0569 MJJ

46.    At all relevant times, E.piphany knew that its advertising and promotional activities, as described above, were literally false, misleading, and deceptive.  E.piphany has acted willfully, deliberately, and in bad faith.

47.    E.piphany's acts described above, including E.piphany's literally false, misleading, and deceptive advertising and promotional activities, are likely to cause, and have caused, confusion, mistake, or deception among the public.

48.    By reason of E.piphany's acts, Sigma Dynamics has suffered and will continue to suffer damage to its business and goodwill, and the loss of sales and profits it would have made but for E.piphany's acts, in an amount to be proven at trial.

49.    E.piphany's acts described above, including E.piphany's literally false, misleading, and deceptive advertising and promotional activities, have caused injury to Sigma Dynamics and the general public and, unless enjoined, will continue to cause injury to Sigma and the general public.  Accordingly, Sigma is entitled to temporary, preliminary, and/or permanent injunctive relief as set forth below.

50.    Moreover, because this is an exceptional case, involving calculated and willful misconduct by E.piphany, Sigma Dynamics is entitled to recover attorneys' fees against E.piphany.

### SECOND CAUSE OF ACTION

### (False Advertising, Cal. Bus. & Prof. Code § 17500)

51.    Sigma Dynamics realleges and incorporates by reference the allegations of paragraphs 1 through 50 of the Complaint as if fully set forth herein.

52.    By the acts described above, E.piphany has made, and continues to make, false and misleading statements in connection with the sale of competing products and service in violation of California Business and Professions Code Sections 17500 *et seq.*, causing injury to Sigma Dynamics and its business and property.

53.    At all relevant times, E.piphany knew that its advertising and promotional activities, as described above, were literally false, misleading, and deceptive.  E.piphany has acted willfully, deliberately, and in bad faith.

- 13 -

1    54.    E.piphany's acts described above, including E.piphany's literally false, misleading,

2    and deceptive advertising and promotional activities, have caused injury to Sigma Dynamics and

3    the general public and, unless enjoined, will continue to cause injury to Sigma and the general

4    public.  Accordingly, Sigma is entitled to temporary, preliminary, and/or permanent injunctive

5    relief as set forth below.

6    ### THIRD CAUSE OF ACTION

7    **(Unfair Competition, Cal. Bus. & Prof. Code § 17200 *et seq.*)**

8    55.    Sigma Dynamics realleges and incorporates by reference the allegations of

9    paragraphs 1 through 54 of the Complaint as if fully set forth herein.

10    56.    By the acts described above, E.piphany has engaged in unlawful and unfair business

11    practices and has performed unfair, deceptive, and misleading acts in violation of California

12    Business and Professions Code Sections 17200 *et seq.*, causing injury to Sigma Dynamics and its

13    business and property.

14    57.    At all relevant times, E.piphany knew that its advertising and promotional

15    activities, as described above, were literally false, misleading, and deceptive.

16    58.    E.piphany's acts described above, including Epiphany's literally false, misleading,

17    and deceptive advertising and promotional activities, have caused injury to Sigma Dynamics and

18    unless enjoined, will continue to cause injury to Sigma.  Accordingly, Sigma is entitled to

19    temporary, preliminary, and/or permanent injunctive relief as set forth below.

20    ### PRAYER FOR RELIEF

21    WHEREFORE, Sigma Dynamics requests that the Court enter judgment in its favor and

22    against E.piphany on its Complaint as follows:

23    A.    That E.piphany, its officers, agents, servants, employees, affiliates, parent or

24    subsidiary corporations, attorneys, and all those in privity or acting in concert with E.piphany, be

25    enjoined temporarily, preliminarily, and/or permanently from making literally false, deceptive, and

26    misleading representations about E.piphany's products and services and from otherwise unfairly

27    competing against Sigma Dynamics;

28

- 14 -

1    B.    That an accounting be entered and judgment rendered against E.piphany for

2    disgorgement of all profits received from the sale of E.piphany's products and services sold during

3    the period that the subject literally false, deceptive, and misleading representations have been

4    made and that Sigma Dynamics be awarded such profits;

5    C.    That E.piphany pay compensatory damages to Sigma Dynamics in an amount to be

6    determined at trial, including Sigma's damage control costs, which are attributable to the subject

7    literally false, deceptive, and misleading advertising and related actions that caused confusion, a

8    likelihood of confusion, and damages to Sigma and its sales, profits, reputation, and goodwill;

9    D.    That E.piphany pay enhanced damages to Sigma Dynamics of at least treble the

10   amount of compensatory damages, due to E.piphany's intentional, willful, deliberate, malicious,

11   egregious, and bad faith actions, and to deter such actions in the future;

12   E.    That E.piphany pay punitive damages to Sigma Dynamics in an amount to be

13   determined at trial, due to E.piphany's intentional, willful, malicious, egregious, and bad faith

14   actions, and to deter such actions in the future;

15   F.    That E.piphany be ordered to correct its advertising and publish appropriate

16   corrective advertisements and press releases, calling the public's attention thereto;

17   G.    That E.piphany pay Sigma Dynamics its costs in bringing this action, including

18   reasonable attorneys' fees and expenses associated with bringing and prosecuting this action; and

19   H.    Such other relief as the Court deems just and reasonable.

20   **DEMAND FOR JURY TRIAL**

21   Sigma Dynamics demands trial by jury of all issues triable by a jury pursuant to Federal

22   Rule of Civil Procedure 38 and Civil L.R. 3-6(a).

23

24   DATED:  July 15, 2004                    PERKINS COIE LLP

25                                           By: _____

26                                               David R. Burtt

27                                           Attorneys for Plaintiff
                                             SIGMA DYNAMICS, INC.
28

- 15 -

**<u>CERTIFICATION OF INTERESTED ENTITIES OR PARTIES</u>**

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

DATED:  July 15, 2004

**PERKINS COIE** LLP

By: _____
David R. Burtt

Attorneys for Plaintiff
SIGMA DYNAMICS, INC.

- 16 -

# EXHIBIT 11

1    SUPERIOR COURT IN THE STATE OF CALIFORNIA

2      FOR THE COUNTY OF SAN MATEO

3

4  EPIPHANY, INC., a Delaware      )
    Corporation,                 )
5                        )
        Plaintiff,            )
6                        )
    vs.                 ) No. CIV-439133
7                        )
    SIGMA DYNAMICS, INC., a     )
8  Delaware Corporation; DAVID   )
    PANEK, an individual;       )
9  CORTNY MEZZETTA CHRISTENSEN, )
    an individual; DOES 1-100,    )
10 inclusive,              )
                        )
11      Defendants,        )
                        )
12 _____)

13

14

15        HIGHLY CONFIDENTIAL

16        ATTORNEYS' EYES ONLY

17        DEPOSITION OF

18        MICHAEL J.A. BERRY

19        MENLO PARK, CALIFORNIA

20        MAY 13, 2005

21

22

23

24  REPORTED BY: JANE H. STULLER, CSR NO. 7223, RPR

25  3-199781

1

# EXHIBIT 11

1    SUPERIOR COURT OF THE STATE OF CALIFORNIA

2        FOR THE COUNTY OF SAN MATEO

3

4    EPIPHANY, INC., a Delaware              )
     Corporation,                           )
5                                           )
          Plaintiff,                        )
6                                           )
          vs.                               ) No. CIV-439133
7                                           )
     SIGMA DYNAMICS, INC., a                )
8    Delaware Corporation; DAVID            )
     PANEK, an individual;                  )
9    CORTNY MEZZETTA CHRISTENSEN,           )
     an individual; DOES 1-100,             )
10   inclusive,                             )
                                            )
11        Defendants,                       )
                                            )
12   _____  )

13

14

15

16        Deposition of MICHAEL J.A. BERRY, taken on

17   behalf of the Defendants, at 101 Jefferson Drive, Menlo

18   Park, California, commencing at 2:10 p.m., Friday, May

19   13, 2005, before Jane H. Stuller, CSR. No. 7223, RPR.

20

21

22

23

24

25

```
 1          A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF

 4    O'MELVENY & MEYERS LLP

 5    BY:  DAVID P. ENZMINGER, ESQUIRE

 6    400 South Hope Street

 7    Los Angeles, California 90071-2899

 8    (213) 430-6000

 9    denzminger@omm.com

10

11    FOR THE DEFENDANTS

12    PERKINS COIE LLP

13    BY:  PAUL J. ANDRE, ESQUIRE

14         KENNETH J. DYER, ESQUIRE

15    101 Jefferson Drive

16    Menlo Park, California 94025-1114

17    (650) 838-4370

18    PAndre@perkindcoie.com

19    KDryer@perkinscoi.com

20

21

22

23

24

25
```

1          I N D E X

2

3  WITNESS:  MICHAEL J.A. BERRY

4

5  EXAMINATION                      PAGE

6     BY MR. ANDRE                    5

7

8

9              EXHIBITS

10

11             DEFENDANTS'

12  NUMBER          DESCRIPTION          PAGE

13

14  288    Epiphany, Inc.'s Supplemental      5

15       Objections and Responses to

16       Defendant Sigma Dynamics, Inc.'s

17       Interrogatory No. 1

18

19

20

21

22

23

24

25

4

1          MICHAEL J.A. BERRY,

2     having been first duly sworn, was

3     examined and testified as follows:

4          EXAMINATION

5  BY MR. ANDRE:

6     Q.  Good morning.  Would you please state and spell

7  your name for the record.

8     A.  My name is Michael Berry.  Berry is spelled

9  B-E-R-R-Y -- like the fruit.

10     Q.  Mr. Berry, are you here today as an expert for

11  Epiphany, the plaintiff in this case?

12     A.  Yes, I am.

13     Q.  And what have you been retained by Epiphany to

14  testify to?

15     A.  I have been retained to form opinions and

16  testify on the trade secrets of Epiphany and the extent

17  to which they seem to appear in the Sigma Dynamics

18  products.

19          MR. ANDRE:  I'll have the court reporter mark

20  as Exhibit 288 a document entitled "Epiphany, Inc.

21  Supplemental Objections and Responses to Defendant Sigma

22  Dynamics Inc.'s Interrogatory No. 1," that is dated May

23  5, 2005 2005.

24          (Whereupon Defendants' Exhibit No 288

25          was marked for identification.)

5

1  recommendation system, inappropriate and even

2  embarrassing recommendations, that led to the

3  development of the surprise factor which would allow a

4  customer to -- to adjust the level of surprise they were

5  willing to tolerate, basically by suppressing

6  recommendations for rarely purchased products.

7      I think that that's one example of the process.

8  You start with something elegant and compact looking on

9  a whiteboard, you implement it.  You run into situations

10  where it doesn't look so good in real life, so you

11  fiddle with it.  That's the process I was referring to.

12      Q.  Are you aware of other companies that have

13  developed similar formulas to obtain similar rebuttal?

14      A.  To my knowledge, before Sigma Dynamics came on

15  the scene, Epiphany really had no competitors in the

16  realtime self-learning marketing model business.

17      Q.  And how about today, are there any competitors

18  in the realtime marketing model systems?

19      A.  I'm not sure.

20      Q.  If you go to page 10, paragraph 9.

21      A.  Uh-huh.

22      Q.  The sentence there reads:  "Epiphany

23        methods and information relating to

24        implementation of dynamic binning and

25        dynamic bucketing."

45

1    And I have no further questions.

2    MR. ENZMINGER:  All right.

3    MR. ANDRE:  Excuse me for interrupting about

4  the tutorial.

5    Q.  But do you have any opinions with respect to

6  whether Epiphany's product was the worlds only software

7  learning closed loop real-time analytic system before

8  Sigma Dynamics came into the market?

9    A.  Yes.  I developed an opinion about that.

10    Q.  And is Sigma Dynamics the second such product?

11    A.  Yes.

12    Q.  Are there any other --

13    A.  My understanding --

14    Q.  I didn't mean to speak over you.  Are there any

15  others, to your knowledge?

16    A.  Not that I know of.

17    MR. ANDRE:  That's all.

18    MR. ENZMINGER:  Just one question:  What did he

19  mean when he said -- what would you call it?  What were

20  you talking about?  What does that mean?

21    THE WITNESS:  I took that to be a description

22  of the Epiphany real-time analytic.

23    MR. ENZMINGER:  What does that mean to you?

24    THE WITNESS:  The closed loop I understand to

25  be marketing jargon for meaning, does all the parts.

89

1       REPORTER'S CERTIFICATION

2

3    I, the undersigned, a Certified Shorthand Reporter

4  of the State of California, do hereby certify:

5  That the foregoing proceedings were taken before me at

6  the time and place herein set forth; that any witnesses

7  in the foregoing proceedings, prior to testifying, were

8  placed under oath; that a verbatim record of the

9  proceedings was made by me using machine shorthand which

10  was thereafter transcribed under my direction; further,

11  that the foregoing is an accurate transcription

12  thereof.

13    I further certify that I am neither financially

14  interested in the action nor a relative or employee of

15  any attorney of any of the parties.

16  IN WITNESS WHEREOF, I have this date subscribed my name.

17

18  DATED: _____

19

20

21  _____
    JANE STULLER
22  CSR No. 7223, RPR

23

24

25

92

# EXHIBIT 12

00001-001-07/23/2001-114705.1

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN MATEO


E.PIPHANY, INC., a Delaware
corporation,

      Plaintiff,

vs.                    CASE NO: CV-439133

SIGMA DYNAMICS, INC., a Delaware
corporation; DAVID PANEK, an
individual; CORTNY MESSETTA
CHRISTENSEN, an individual, and
DOES 1-100, inclusive,

      Defendants.
                         /


DEPOSITION OF DONALD DUREAU

Wednesday, February 16, 2005

Pages 1 - 140

ATTORNEYS' EYES ONLY


REPORTED BY JOANNE ICHIKI, CSR #11660


□

2

DONALD DUREAU
ATTORNEYS' EYES ONLY

**EXHIBIT 12**

```
 1                 A P P E A R A N C E S

 2    FOR THE PLAINTIFF:

 3         O'MELVENY & MYERS, LLP

 4         BY:  RYAN J. PADDEN, ESQ.

 5         Embarcadero Center West

 6         275 Battery Street, Suite 2600

 7         San Francisco, California 94111-3305

 8         (415) 984-8700

 9

10    FOR THE DEFENDANTS SIGMA DYNAMICS, INC. AND CORTNY

11    MEZZETTA CHRISTENSEN:

12         PERKINS COIE, LLP

13         BY:  DAVID R. BURTT, ESQ.

14         180 Townsend Street, Third Floor

15         San Francisco, California 94107-1909

16         (415) 344-7036

17

18

19

20

21

22

23

24

25
```

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

□

DONALD DUREAU

ATTORNEYS' EYES ONLY

```
 1                    I N D E X

 2   EXAMINATION BY:                            PAGE

 3   Mr. Burtt                                    4

 4

 5                  E X H I B I T S

 6   EXHIBIT NO.          DESCRIPTION          PAGE

 7     49      Copy, log of instant messaging    102

 8             between D. Dureau and D. Perona,

 9             12/10/03 to 4/5/04, Bates Nos.

10             SIG-TS 031356 to SIG-TS 031363,

11             8 pages

12

13     50      Copy, e-mail from D. Dureau to    121

14             S. Iverson, 10/1/03, Bates Nos.

15             EP122173 to EP122174, 2 pages

16

17     51      Copy, postings on Stand Up -      137

18             Speak Out by Don Dureau, Sr.,

19             various dates, 5 pages

20

21

22

23

24

25
```

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

4

DONALD DUREAU
ATTORNEYS' EYES ONLY

1   meanings to different people, let's try to make sure

2   we're on the same page.

3          What is your definition of a non-compete

4   agreement?

5      A.   That I was not to go to work for any of the

6   customers I worked for directly while I was working for

7   Card Systems on one of their projects.

8      Q.   And Berger was not a Card Systems customer?

9      A.   Correct.

10     Q.   Do you recall whether that Card Systems

11  agreement also required that you not work for a

12  competitor of Card Systems, as opposed to a customer?

13     A.   I do not recall.

14     Q.   Using that definition of non-compete, did you

15  have to sign a non-compete agreement with Modis?

16     A.   I do not remember specifically.

17     Q.   What was your next job after Modis?

18     A.   E.Piphany.

19     Q.   You would not consider E.Piphany and Modis to

20  be competitors, would you?

21     A.   No, I would not.

22     Q.   What year did you start at E.Piphany?

23     A.   1999.

24     Q.   And you've worked for E.Piphany ever since?

25     A.   I have.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

13

DONALD DUREAU
ATTORNEYS' EYES ONLY

1    Sigma ever had communication with you about you coming

2    to work for Sigma Dynamics?

3        A.    No.

4        Q.    How about any head hunters?

5        A.    No.

6        Q.    What was your next role after regional

7    director?

8        A.    I was Vice President of the Central Region and

9    I -- that was the title.

10       Q.    Do you have a new business card every time your

11   title changes?

12       A.    I don't.

13       Q.    Did you have any jobs between regional director

14   of the central region and your current title?

15       A.    Regional director of the central region?

16             MR. PADDEN:  You've gotten -- are you asking

17   about --

18             MR. BURTT:  What was his answer to my last

19   question?

20             THE WITNESS:  Vice President of Central Region.

21   BY MR. BURTT:

22       Q.    Today you're Vice President of Worldwide

23   Services?

24       A.    I am.

25       Q.    What was your job immediately preceding that?

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

32

DONALD DUREAU
ATTORNEYS' EYES ONLY

1        A.   Vice President of Central Region.

2        Q.   Did you have any other titles at E.Piphany

3   other than what we've discussed already?

4        A.   Not that I recall.

5        Q.   Did your duties for E.Piphany ever extend

6   beyond implementing or working with customers, working

7   in relation to the marketing component?

8        A.   My current job duties are running the overall

9   services organization, which has consultants which

10   employ all of our platforms.

11        Q.   Today how many individuals are employed in the

12   services organization?

13        A.   65.

14        Q.   Do you have direct customer contact in your job

15   today?

16        A.   I do.

17        MR. PADDEN:  If we're going to get into

18   customers, we'd like to mark this transcript as

19   Attorneys' Eyes Only under the protective order.

20        MR. BURTT:  Good idea.

21   BY MR. BURTT:

22        Q.   Do you have more or less customer contact today

23   than you did in your first few years at E.Piphany?

24        A.   I have contact with more customers for shorter

25   durations.

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

33

DONALD DUREAU
ATTORNEYS' EYES ONLY

1      Q.   There are competitors to Interaction Advisor;

2    right?

3      A.   Are we -- I guess if we consider Sigma one,

4    then the answer is yes.  Otherwise, I'm not sure we

5    consider many people competitors for that product.  It's

6    fairly unique.

7      Q.   Do you personally consider Sigma to be a

8    competitor to Interaction Advisor?

9      A.   I believe that they probably are, but I do not

10   know for sure.  It's just a hunch.

11     Q.   Do you know how many customers Sigma has today?

12     A.   You've already asked me that.

13          MR. PADDEN:  Objection.  Asked and answered.

14          THE WITNESS:  Okay.

15   BY MR. BURTT:

16     Q.   The answer was no?

17     A.   Correct.

18     Q.   Do you consider Chordiant to be a competitor of

19   Interaction Advisor?

20     A.   No.

21     Q.   Sitting here today, other than Sigma Dynamics,

22   you can't think of any other companies you would

23   personally consider to be a competitor of Interaction

24   Advisor?

25     A.   I can think of companies that offer part of

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

DONALD DUREAU
ATTORNEYS' EYES ONLY

1    that solution but not all of them.  And my definition of

2    a direct competitor would be something that could offer

3    all those aspects.

4        Q.   So Siebel doesn't offer all the aspects of

5    Interaction Advisor?

6        A.   Not to my knowledge.

7        Q.   Who were some companies that offered parts of

8    that solution?

9        A.   SAS is a data mining company.  I'm sure there's

10    -- I don't know the names of any other specific once.

11       Q.   How about Oracle?

12       A.   I've never seen a product that I consider to be

13    a competitor of part.

14       Q.   PeopleSoft?

15       A.   Same.

16       Q.   The last sentence of this, next to the last

17   paragraph you say, "they are itching to expand on that

18   competency."

19       A.   Um-hum.

20       Q.   What competency are you referring to there?

21       A.   Again, to the previous sentence in that

22   paragraph.  In general, that if all of the things that

23   people are saying are true and they need to hire, right,

24   then this is a unique competency that takes a long time

25   to grow, that it would stand to reason that they would

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing

DONALD DUREAU
ATTORNEYS' EYES ONLY

1          I, JoAnne Ichiki, duly authorized to administer

2    oaths pursuant to Section 2093(b) of the California Code

3    of Civil Procedure, do hereby certify:  That the witness

4    in the foregoing deposition was administered an oath to

5    testify to the whole truth in the within-entitled cause;

6    that said deposition was taken at the time and place

7    therein cited; that testimony of said witness was

8    reported by me and thereafter transcribed under my

9    direction into typewriting; that the foregoing is a

10   complete and accurate record of said testimony; and that

11   the witness was given an opportunity to read and correct

12   said deposition and to subscribe the same.

13          Should the signature of the witness not be

14   affixed to the deposition, the witness shall not have

15   availed himself/herself of the opportunity to sign or

16   the signature has been waived.

17          I further certify that I am not of counsel nor

18   attorney for any of the parties in the foregoing

19   deposition and caption named nor in any way interested

20   in the outcome of the cause named in said caption.

21   DATED:  February 22, 2005

22

23                            JOANNE ICHIKI
                              CERTIFIED SHORTHAND REPORTER
24                            NO. 11660

25

Comp-U-Scripts/GROSSMAN & COTTER/Weber & Volzing